KINETICO, INC., APPELLEE, *v.* INDEPENDENT OHIO NAIL CO., D.B.A. SPENCER PRODUCTS CO. ET AL., APPELLANTS.

(Nos. 47464 and 47476—Decided
September 4, 1984.)

*Conway, Barclay, Deyo & Kurant
Co., L.P.A., Donald K. Barclay* and
*Michael K. Rode,* for appellee.

*Thompson, Hine & Flory, Michael
M. Hughes* and *Paul N. Harris,* for ap-
pellant Independent Ohio Nail Co.

*Gallagher, Sharp, Fulton & Nor-
man, John B. Robertson* and *Thomas J.
Kaiser,* for appellant Industrial Retain-
ing Ring Co.

PRYATEL, J. Plaintiff-appellee Ki-
netico, Incorporated (hereinafter
"Kinetico") filed suit for breach of con-
tract and breach of warranty against
two defendants-appellants. Defendant-
appellant Industrial Retaining Ring
Company (hereinafter "IRR") is the
manufacturer of a certain type of ring
used by Kinetico in producing water
softeners. Defendant-appellant Indepen-
dent Ohio Nail Company, d.b.a. Spencer
Products Company (hereinafter "Spen-
cer") was the distributor and seller of
this ring to the plaintiff. After a jury
trial, Kinetico was awarded $550,000 in
damages against both defendants-appel-
lants.

Kinetico is an Ohio corporation
founded in 1970, which began selling
water softeners in 1973. Annual sales in-
creased from fifteen hundred in 1975 to
seventeen thousand in 1982. Through
dealers, Kinetico sells its water
softeners to consumers in almost every
state and in Canada.

Assembly of Kinetico's water soft-
ener requires the installation of a certain
type of retaining rings, known as "e-
rings." Kinetico had been buying all of
its e-rings from Bearings, Inc., a distri-
butor located in Painesville who pur-
chased them from Waldes Retaining
Rings, the manufacturer. However, in
January 1979, Waldes was faced with
production problems (a strike) and Bear-
ings, Inc. was no longer able to fill
Kinetico's orders for e-rings.

Earlier (in 1978), Randy Reitnour, a
salesman from Spencer, informed Kine-
tico that Spencer could supply Kinetico
with e-rings that were comparable to the
Waldes e-rings. Thus, in January 1979,
faced with the inability of obtaining the
e-rings from its regular supplier (Bear-
ings, Inc.), Kinetico ordered (through
Spencer) twenty thousand e-rings from
IRR. A second order for twenty-five
thousand e-rings for $450 was lodged in
February 1979 and placed into produc-
tion in March 1979.

In either March or April 1979, Kine-
tico assemblers began to experience
cracking of the e-rings when they were
inserted into the water softeners. In late
April or early May 1979, Kinetico re-
ceived reports from some dealers that
upon investigating failed water soft-
eners, they noticed that the e-rings were
either cracked or missing. When
Kinetico linked this problem to the use
of the e-rings from the second shipment
of IRR e-rings, Kinetico pulled the re-
maining e-rings (from the second order)
out of production.

As additional complaints arrived,
Kinetico's dealers ordered fewer water
softeners. According to Kinetico's vice
president, sales dropped sharply. Kine-
tico also received valves returned for
repair or replacement due to e-ring
failure. Kinetico repaired some units
and replaced others, incurring shipping
and handling expenses as well as addi-
tional labor costs. Employees of Kine-
tico were flown to dealers in other
states, to repair the water softeners in
stock as well as those already sold to
customers. Kinetico also incurred ex-
penses for long distance phone calls and
letters on complaints about defective

e-rings. Kinetico's vice president testified that he believed his company had experienced a loss of goodwill but no dollar figure or estimate was allocated to this particular claim of damages.

The jury returned a verdict against both defendants-appellants for $550,000.[1] After this verdict, IRR filed motions for judgment notwithstanding the verdict, for a new trial, and for a remittitur of damages, while Spencer filed a motion for a new trial. All motions were based on the alleged excessiveness of the damages and all were denied. Neither appellant has appealed the issue of liability; only the amount of damages has been challenged.

Appellant Spencer has cited four assignments of error,[2] while appellant IRR has assigned two. Issues common to both appellants are addressed together.

Appellant Spencer's Assignment of Error No. 1:

"I. The trial court erred in receiving plaintiff's evidence of lost profits."

Appellant IRR's Assignment of Error No. 2:

"II. The trial court committed prejudicial error in admitting testimony of lost profits in the sum of $303,277.44 when said figure and the method used to arrive at it were unsupported by foundation, patently unreliable and constituted inadequate proof of damages as a matter of law."

Appellants argue that the trial court erred in receiving evidence of lost profits because it was unsupported and unreliable. We find insufficient evidence on two components of this item of damages: the sales quotas and the figure used as the net profit on each water softener.

The vice president of Kinetico, James Kewley, testified that while the annual sales of water softeners had increased steadily from fifteen hundred in 1975 to seventeen thousand in 1982, the monthly sales in 1979 began dropping sharply in June, after the problem of defective e-rings was reported by dealers and consumers. Kewley testified that his company had developed sales quotas for each month in 1979, and that until June 1979 the actual sales generally exceeded the projected sales:

|           | Projected Sales | Actual Sales |
|-----------|-----------------|--------------|
| January   | 1,035           | 1,263        |
| February  | 1,100           | 1,054        |
| March     | 1,205           | 1,231        |
| April     | 1,270           | 1,287        |
| May       | 1,335           | 1,302        |
|           | 5,945           | 6,137        |

According to Kewley, from January to June 1979, Kinetico sold one hundred ninety-two more units than the total projected sales for that period, and beginning in June there was a sharp drop in monthly sales.

|           | Projected Sales | Actual Sales |
|-----------|-----------------|--------------|
| June      | 1,430           | 644          |
| July      | 1,440           | 847          |
| August    | 1,495           | 1,138        |
| September | 1,525           | 1,228        |
| October   | 1,495           | 1,091        |
| November  | 1,415           | 900          |
| December  | 1,320           | 964          |
|           | 10,120          | 6,812        |

From June to December 1979, Kinetico sold 3,308 fewer units than projected for that period.

In explaining the projected sales, however, Kewley indicated that the

---

[1] Defendant Spencer had filed a cross-claim against defendant IRR. At the close of the evidence, the trial court granted a directed verdict in favor of Spencer for contribution from IRR. Both defendants filed appeals which were consolidated for argument.

[2] The assignments of error listed at the beginning of appellant Spencer's brief differ from those argued by brief; thus, pursuant to App. R. 12(A), we will only address those errors argued in the text of the brief.

above quotas were "established by the sales department" and were based in part on "new areas we were opening." No one from the sales department testified as to how or exactly when these sales quotas were developed:

"Q. How is a quota of sales established at Kinetico or was it established in 1979?

"A. Well, the quota [was] established by the sales department and came from data that they generated from our sales agents and from past performance of dealers and new areas we were opening, and performance of territory which we had active in previous years, that sort of thing.

"Q. Do you, as a vice president of Kinetico, have anything whatsoever to do with the formulation of those quotas?

"A. They were generated by the sales department, then typically referred to by myself. * * *"

Kewley's statement that the quotas were referred to him by the sales department does not satisfy the requirement that a witness must testify as to facts within his personal knowledge.

There was no data on performance from prior years when the product was moved into a new territory, nor was there any comparison to monthly sales of years prior to 1979. Thus, there was no evidence indicating that the sales quotas for new territories were beyond speculation.

As to the dollar amount for net profits, Kewley testified on direct examination that the average net margin on each unit was $91.68; however, there was no evidence on how much each water softener cost to produce, and no breakdown of the expenses of production, *i.e.,* parts, labor, overhead, etc. Nor was the jury informed of the price of water softeners. There is only the witnesses' conclusion that $91.68 represents the profit on each unit that would have been sold:

"A. We took those 3,108 units [*sic*] [the number below the sales quota] and multiplied that by what is termed our net margin or net profit on the sale. That would be the difference between our average sale price and our standard cost, but from the average standard price, we subtracted the sales commission that normally would be made on that unit. We didn't actually pay the net margin and standard cost, and the average sale price less sales commission.

"Q. All right. What was that figure again?

"A. $91.69 [*sic*]."

The necessity of evidentiary support becomes glaringly evident upon reviewing Kewley's cross-examination, which follows:

"Q. You called that the net margin, what does that mean?

"A. That was the difference. We couldn't take a specific item off of our sales price list. It was calculated over what the average sales price was, less the direct sales commission, that would be the net amount. The net amount that we received revenue for that unit.

"Q. So that total amount is less commission that you receive in the average dollar over your various product lines?

"A. We took that amount, less what it costs to produce that unit for the same average. That is $91.68."

Then, we reach the matter at issue:

"Q. That [$91.68] represents what your profit is?

"A. We * * * *it's not profit.* It's the amount [$91.68] that covers our operating expenses, *our profit would be a very small portion of our margin on the unit.*" (Emphasis is added.)

To make sure there was no misunderstanding, he was asked:

"Q. $91.68 is certainly not your profit per unit?

"A. *No.* [Emphasis added.]

"Q. What was your profit per unit?

"A. In 1979, the company didn't ever lose money.

"Q. I am not talking about for the year, I am talking about per unit.

"A. You can only do it on an annual basis, if you didn't make any money, you made no profit on any unit.

"Q. Mr. Kewley, let's say that in May of 1979, in costing your units, you took into consideration and the costing of your units I am talking about the sales price to the dealer and what your profit should be, did you not, in order to make a profit on each unit that you sold?

"A. Not really.

"Q. You didn't?

"A. We have a multiplication factor. We multiply it times our cost. If your sales do not exceed the revenues generated to cover operating expenses, then you generate no profit."

Nor is the final answer on this issue of any assistance:

"Q. That's the way you arrived at your calculation?

"A. We took the direct cost of producing the unit, subtracted what we felt we would get — what we were getting for selling the unit, less sales commission, that was something we did not have to pay because we did not incur a sales commission, that was the net margin and is the number reflected."

Nor was there any attempt to rehabilitate the witness on this testimony on redirect examination.

The injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally courts have required greater certainty in the proof of damages for breach of contract than for a tort. Restatement of the Law 2d, Contracts (1981) 144, Section 352.

In Ohio, a defendant who is sued for breach of contract may be liable to a plaintiff for loss of profits. *Stephan's Machine & Tool* v. *D & H Machinery Consultants* (1979), 65 Ohio App. 2d 197, 202 [19 O.O.3d 155]. However, in *Stephan's* the loss of profits was capable of measurement, since the plaintiff had already been hired by customers for work at a certain price which had to be cancelled because of the defendant's (D & H Machinery's) breach.

In *Battista* v. *Lebanon Trotting Assn.* (C.A.6, 1976), 538 F. 2d 111, 119, the court, applying Ohio law, stated that proof of lost profits may not be speculative but must be reasonably certain. That court denied a speculation by the plaintiff that a price increase in his product would have increased profits by over three hundred percent.

Further, there must be more than a conclusory statement as to the amount of lost profits, without explanation of how that sum was determined:

"More is required of the plaintiff than merely his assertion (either directly or through an expert witness) that he would have made a particular amount in profits. Unless the figure is substantiated by calculations based on facts available or in evidence, the courts will properly reject it as speculative or uncertain. * * *"

R. Dunn, Recovery of Damages for Lost Profits 2d (1981) 223, Section 5.4. If sufficient proof of the underlying facts is lacking, the judgment must be reversed for a new trial:

"The evidence is part of plaintiff's case and he must prove it. A judgment in favor of plaintiff based on gross income or calculated without proper proof of all expenses must be reversed for a new trial; a judgment against plaintiff on these facts must be sustained. * * *"

Dunn, *supra*, at 247-248, Section 6.3. Furthermore, if the plaintiff has not presented sufficient evidence of all expenses and calculations, the defense counsel is not obligated to clarify this evidence upon cross-examination:

"A plaintiff may not recover upon the weakness of the testimony of the defense, but upon the strength of its own proof." *Price Brothers Co.* v.

*Walters* (App. 1951), 65 Ohio Law Abs. 443, paragraph four of the syllabus.

We conclude that the evidence of lost profits was not proven here, and that clarification is needed on how both the sales quotas and the net profit figure were determined. Appellant Spencer's first assignment of error and appellant IRR's second assignment of error are well-taken.

Appellant Spencer's Assignment of Error No. II:

"II. The trial court erred in permitting plaintiff's witness to testify as to injury to goodwill and in instructing the jury on that element of damages."

Appellant IRR's Assignment of Error No. I:

"I. The trial court erred in permitting plaintiff's witness to testify as to claimed injury to goodwill and in instructing the jury on that element of damages.

"A. Damages of that nature were unrecoverable as a matter of law in this action.

"B. Neither the fact nor the amount of such damages is discernible from the record, and the jury should not have been charged thereon."

Both appellants argue that it was error to allow the jury to consider awarding damages for goodwill.

In view of our ruling holding that loss of profit was not established, a discussion of any loss of goodwill may well be academic. No specific sum was requested for "goodwill" other than Kewley's self-serving declaration that such a loss was sustained.

Again, we note that a party cannot recover damages beyond the amount established with reasonable certainty. In our judgment there was a lack of evidence of damages for goodwill. Examining Kewley's testimony, we find that he defined loss of goodwill as the loss of reputation among the dealers who purchased the water softener, yet no dealer or any other witness was called to testify on this issue. Thus, the jury heard only Kewley's hearsay testimony. The claimed damage was that these dealers temporarily ceased purchasing Kinetico's water softeners and instead bought this product from competitors of Kinetico. While it is conceivable that there can be damages for goodwill and lost profits, we find no evidence of any specific amounts for lost goodwill.[3] Although an exact calculation is not required, here there is no evidence on any amount for this claim.

Loss of goodwill should be proven by detailed business records before and after the breach, as well as testimony by those who have first-hand knowledge of such loss. An example that parallels the facts here is presented in the Restatement of the Law 2d, Contracts (1981) 146, Section 352, Illustration 4:

"4. A, a manufacturer, makes a contract with B, a wholesaler, to sell B a quantity of plastic. B resells the plastic to dealers. The plastic is discovered to be defective and B has many complaints from dealers, some of which refuse to place further orders with him. B can recover the loss of good will *if* his loss can be estimated *with reasonable certainty by such evidence* as his *business records* before and after the transaction *and the testimony of his salespersons and that of dealers.*" (Emphasis added.)

Where loss of goodwill is not adequately proven by expert testimony, the trial court should not allow the jury to speculate as to what those damages

---

[3] Appellants also argue that damages for goodwill are not recoverable in Ohio. We find no Ohio authority for this position; however, we are unable to reach this issue because no competent evidence on the loss of goodwill was presented in this case. Cf. *Charles R. Combs Trucking, Inc.* v. *International Harvester Co.* (1984), 12 Ohio St. 3d 241, 244-245.

would be and should direct a verdict against any damages for goodwill. *Roundhouse* v. *Owens-Illinois, Inc.* (C.A.6, 1979), 604 F. 2d 990.

We therefore hold that the trial court erred in submitting the issue of goodwill damages to the jury. Appellant IRR's first assignment of error and appellant Spencer's second assignment of error are sustained.

Appellant Spencer's Assignment of Error No. III:

"III. The trial court erred in permitting plaintiff's witness to estimate damages for increased office expense."

Appellant Spencer argues that the trial court erred in allowing Kewley, vice president to Kinetico, to estimate the cost of increased office expense incurred to determine where the faulty water softeners had been sold.

R.C. 1302.89(A) defines allowable "incidental damages" as follows:

"(A) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."

Kewley testified that Kinetico incurred increased costs of $5,000 for research,[4] and to make telephone calls to dealers to correct the problem.

Once again, we find that there is no testimony indicating how this $5,000 figure was computed; Kewley simply made the unsupported statement that the sum represents the estimated total costs for all of the extra office expenses. No breakdown for each individual cost was given, nor did he provide any documentation or evidence to support such expenses, notwithstanding that such evidence appears to be ascertainable. Indeed this unclassified lump sum of $5,000 is more than the aggregate amounts[5] requested to pay for (1) the labor required to disassemble and inspect valves in stock ($1,267.50), (2) to repair valves returned to Kinetico ($284.84), and (3) for freight costs ($1,113.00) and (4) handling and packaging costs ($1,778.34).

Where an employee of a company simply testifies that the damages amount to a certain sum, without explaining the breakdown of individual items, that testimony is nothing more than a conclusion. *Advertisers Exchange* v. *Bleich* (App. 1943), 40 Ohio Law Abs. 212. In that case, the reviewing court found that there was no underlying evidence to explain the plaintiff company treasurer's conclusory statement that the damages amounted to $182, and the court reversed the judgment for a new trial.

Since there is no evidence of the individual costs or an explanation of the $5,000 estimate, we find Spencer's third assignment of error to be well-taken.

Appellant Spencer's Assignment of Error No. 4:

"IV. The verdict and judgment are contrary to the manifest weight of the evidence."

Appellant points out that the testimony regarding the cost of replacing valves was erroneously computed. Kewley explained that this loss equaled the number of valves replaced (1,471) multiplied by the cost of replacing each valve.($74.22), which he testified to be $195,169.74. The correct calculation is $109,177.62. In closing argument, Kinetico's counsel asked for $105,169.74

---

[4] It is not clear whether this item of damage includes the cost of research done by the independent testing laboratories. If so, a Mr. Baker, who testified as to the results of this research, should have been asked to document the expense of such work.

[5] $4,443.68.

for this item of damages, incorrectly based on one thousand four hundred seventeen valves claimed to be replaced rather than one thousand four hundred seventy-one valves testified as replaced.[6]

Notwithstanding that this item of claimed damages was overstated by approximately $86,000, no effort was made by counsel to stipulate that the correct figure was $109,177.62, or $85,992.12 less than the sum in evidence. Since the jury was instructed that closing arguments are not evidence, the jury was left with an admittedly inaccurate figure to consider on this item, hence, we must reverse and remand on the final assignment of error as well.

This cause is reversed and remanded for a new trial solely on the issue of damages.

*Judgment reversed
and cause remanded.*

JACKSON, P.J., concurs separately.

NAHRA, J., concurs in judgment only.

JACKSON, P.J., concurs separately. Based upon the record of evidence adduced at trial, it is clearly apparent that appellee Kinetico sustained substantial damages resulting from the defective parts supplied by appellants, Independent Ohio Nail Company, d.b.a., Spencer Products Company, and Industrial Retaining Ring Company. However, some of the evidence of damages was speculative or conclusory in nature. "Projected sales" are not as reliable a benchmark to measure loss as are records of actual sales. Also, as the court observes, some of the evidence concerning loss profits, damage to goodwill, and incidental damages, was

---

[6] 1417 x $74.22 equals $105,169.74, while 1471 x $74.22 is $109,177.62.

inadmissible because no "reasonably certain" means of demonstrating these losses was established. If a proper foundation for this evidence had been laid, its relevance might have been established. On the basis of the record before this court, however; some of this evidence was not admissible. This inadmissible evidence may well have influenced the verdict of the jury.

Accordingly, it is appropriate, in my opinion, for this court to reverse the judgment of the trial court, and remand for a new trial on the issue of damages.

NAHRA, J., concurring in judgment only. I believe Kinetico's evidence was sufficient to establish lost profits and to permit the jury to consider this element of damages. Anticipated profits must be shown with reasonable certainty. *Battista* v. *Lebanon Trotting Assn.* (C.A. 6, 1976), 538 F.2d 111, 119. However, it is well-established that the "reasonable certainty" requirement applies only to the cause or fact of damages and not to the amount of damages. See, *e.g., Borne Chemical Company, Inc.* v. *Dictrow* (1981), 85 App. Div. 2d 646, 651, 445 N.Y.Supp. 2d 406, 413-414; see, also, Dunn, Recovery of Damages for Lost Profits 2d (1981), Section 1.4 at 9 and Section 5.1 at 215. Mathematical precision, therefore, is not required. *Jay Edwards, Inc.* v. *New England Toyota Distributor, Inc.* (C.A.1, 1983), 708 F. 2d 814, 821, certiorari denied (1983), 78 L. Ed. 2d 231; see R.C. 1302.89, Official Comment 4.

One of the most common methods of proving lost profits damages is by estimates or projections. Dunn, *supra,* at 215, Section 5.1; see *Hollweg* v. *Schaefer Brokerage Co.* (C.A.6, 1912), 197 F. 689, 702 (evidence of probable sales admissible and not open to criticism of uncertainty and speculation). Another well-accepted method is to compare the experience of plaintiff's

own business before and after the alleged wrongful act of the defendant(s). Dunn, *supra,* at 223-224, Section 5.5. Kinetico utilized both methods in proving its lost profits damages.

Kewley testified that sales quotas were established for 1979. These projections were generated internally based upon past sales performances and without regard to this litigation. In fact, Kinetico's total sales in the first five months of 1979 actually exceeded the projected or estimated sales figures. Moreover, the sales quotas were shown to be conservative estimates based upon the past history of Kinetico's sales, which have increased annually since 1973-1974.

For these reasons I believe the evidence was sufficient to establish lost profits damages. I agree that under the facts presented the jury was improperly instructed that it could make an award for loss of goodwill. Since the jury obviously made such an award, a new trial is appropriate on the issue of damages only.