MODIC, Appellee,

v.

MODIC, Appellant.

[Cite as *Modic v. Modic* (1993), 91 Ohio App.3d 775.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63657.

Decided Nov. 8, 1993.

*Edward J. Galaska,* for appellee.

*Alan I. Goodman,* for appellant.

PORTER, Judge.

Defendant-appellant Robert Modic appeals from a jury verdict of $100,000 in favor of plaintiff-appellee William Modic, his father, arising out of their common ownership of certain business and property. Defendant claims the court erred in dismissing his counterclaim; in not allowing an offset of the father's damages; in failing to dismiss plaintiff's damage claims for lack of proof; and in failing to join a proper party. For the reasons hereinafter stated, we modify and affirm on condition.

## STATEMENT OF FACTS

The father and son each owned a fifty-percent interest in a business known as "AAA Cleveland Transmission Service, Inc.," which started in 1959 and was engaged in rebuilding auto transmissions. The parties also jointly owned as

tenants in common two parcels of Cleveland real estate which are at issue in this case: one located at 7017 St. Clair Avenue at which the Cleveland Transmission business was carried on ("the transmission property"), and one located several blocks away at 6623 St. Clair Avenue, which originally was a gas station site, later converted to a car wash facility ("the car wash property").

The father ran the car wash business from 1973 to approximately 1977; during this same period and until 1981, the son ran the transmission business. The parties stipulated and the court instructed the jury that "each of the parties were [*sic* ] entitled to receive one-half of the net profits from the Cleveland Transmission business." When the car wash business closed in 1977, the parties' relationship fell apart and they talked about dividing things up in 1978. They were not able to agree on the division.

On July 25, 1980, the father filed suit in common pleas court for an accounting of the profits from the son's operation of the transmission business. Soon thereafter, the father took over the operation of the transmission business on October 1, 1981. This suit was eventually dismissed without prejudice early in 1988 and refiled on August 24, 1988. The father's complaint alleged that he and his son were co-owners of the transmission business with an equal sharing of profits. The father also alleged that the son had run the transmission business from 1973 to 1981 and deprived the father of his share of profits therein for the years in question through fraud, deceit and concealment.

The answer to the complaint admitted co-ownership of the business but denied the substantive allegations. A defense of failure to join an indispensable party (Cleveland Transmission) was *not* asserted. The son's counterclaim alleged (1) contributions due from the father for car wash business obligations; (2) breach of contracts and sums owing from the father's operation of the transmission business since September 1981 to trial; (3) contribution for taxes of the transmission business prior to October 1981; and (4) an accounting as to income and expense of the transmission business since October 1981.

This case was tried to a jury commencing January 13, 1992. The transcript of the trial presents a contentious and sometimes confusing array of charges and countercharges as the parties disputed the way the businesses were handled and their respective roles therein. The trial was plagued by missing or incomplete documentation for which the parties tended to blame each other.

The father presented evidence that the son, in operating the transmission business, paid himself salaries and gave himself loans never repaid that were allegedly used to make home improvements. He introduced corporate tax returns from 1975 to 1979 to show his son's compensation and the loans. He maintained that other substantial receipts of the business were not reported on the company books and that the corporate tax returns did not report one half of

the income of the business.  In final argument, the son's counsel "concede[d] that these figures show there has been an underreporting of income * * *.  I'm not saying [the son] reported everything.  He obviously very clearly has not."

The son, for his part, offered evidence that the father failed to account to him for rents or profits of the car wash business and later the reasonable rentals that the two properties would have returned after the father took over the operation of the transmission business in 1981.

It is fair to say that at the trial the son's strategy was to offset the father's claims rather than to obtain an affirmative recovery for himself.  To that end, the son claimed he was entitled to one half of the reasonable rental value of the two real properties from 1981 onward.  This strategy is admitted by the son on appeal:  "In essence, appellant contended that if he owed his father anything arising out of the manner in which he operated Cleveland Transmission from 1973 through 1981, his debt was more than offset by what his father owed him for his exclusive use of the jointly owned properties."  He claimed the father owed him one half of the fair rental value of the jointly owned properties.

At the conclusion of all the evidence, the trial court dismissed the son's counterclaim for fair rental value and the case went to the jury on the father's claims.  The jury returned a unanimous verdict of $100,000 in favor of the father.  The son's motions for judgment notwithstanding the verdict and a new trial were denied.

We will address the assignments of error in the order asserted.

"I.  The court erred in dismissing appellant's counterclaim for rents and in denying appellants [sic] motion for new trial filed on the same grounds."

■  The son argues that the court erred in dismissing the counterclaim for his share of rental value because of its failure to give effect to R.C. 5307.21.  The father points out that this statute was never raised at trial or argued to the trial court.  The statute states as follows:

"One tenant in common, or coparcener, may recover from another tenant in common, or coparcener[,] his share of rents and profits received by such tenant in common or coparcener from the estate, according to the justice and equity of the case.  One coparcener may maintain an action of waste against the coparcener.  No coparcener shall have any privileges over another coparcener, in any election, division, partition, or matter to be made or done, concerning lands which have descended."

The statute is contained in that section of the Revised Code dealing with equitable actions in partition.  (R.C. Chapter 5307.)

Nevertheless, there is respectable authority to support the son's claim that a co-tenant out of possession is entitled to his share of the reasonable rental value of the property exclusively used by the other co-tenant. In construing Section 12046 of the General Code, the precursor to R.C. 5307.21, the Ohio Supreme Court so held in *Cohen v. Cohen* (1952), 157 Ohio St. 503, 47 O.O. 363, 106 N.E.2d 77.

In *Cohen*, the widower, as part of an antenuptial agreement, was required to build a home for him and his wife and convey an undivided one-half interest to the wife. The husband died and left his interest in the property to his children by his first marriage. The wife continued to occupy the premises for a period of time. Except for the garage, no part of the property was leased to outsiders and there was no rental income received by the widow. The children never made a demand to occupy the premises nor did the widow ever deny them access. The children sued for a proportionate share of the reasonable rental value. The Supreme Court held as stated in the syllabus:

"By virtue of Section 12046, General Code, a tenant in common of land and a residence and buildings thereon, who lives in, occupies and has sole possession of the premises, is liable to account to his cotenants for their share of the reasonable rental value of such occupancy, possession and use. (*West v. Weyer*, 46 Ohio St. 66 [18 N.E. 537], approved and followed.)"

In reversing the appellate court, the court held in *Cohen* that the receipt of rents and profits would include a co-tenant's exclusive enjoyment of occupancy, and such usage was sufficient to create a liability on a tenant in possession. The court noted that there was no agreement to pay rents, nor did any of the co-tenants ask or demand possession of the premises or any share of the rents prior to suit. Citing *West*, the court stated that:

"[P]laintiff received value by occupying the premises as a home, rent free, and, therefore, under the doctrine of the *West* case, is obligated to account to her cotenants for their share of the fair rental value of the occupancy." *Id.*, 157 Ohio St. at 511, 47 O.O. at 367, 106 N.E.2d at 81.

Other appellate decisions similarly construing the statute are *Collins v. Jackson* (1986), 34 Ohio App.3d 101, 103, 517 N.E.2d 269, 271; *Lipps v. Lipps* (1951), 90 Ohio App. 578, 579, 48 O.O. 213, 214, 100 N.E.2d 862, 863; *Warner v. Matthews* (1946), 79 Ohio App. 111, 112–113, 34 O.O. 482, 483, 69 N.E.2d 59, 60; *Aubrey v. Aubrey* (1941), 70 Ohio App. 298, 303, 25 O.O. 56, 58, 45 N.E.2d 892, 894.

Therefore, we must conclude that the trial court erred in dismissing the counterclaim. Even though the son originally asked for an accounting in his counterclaim, at trial, he offered his own opinion evidence of the rental value of

the property in which he was entitled to share. This evidence was admitted so it is clear that the issues not raised in the pleadings were tried by express or implied consent of the parties, and shall be treated in all respects as if they had been raised in the pleadings. Civ.R. 15(B); *Deist v. Timmins* (1986), 32 Ohio App.3d 74, 75, 513 N.E.2d 1382, 1383.

■ A co-owner of the property is entitled to give an opinion as to its rental value. Cf. *Smith v. Padgett* (1987), 32 Ohio St.3d 344, 347–348, 513 N.E.2d 737, 740 ("lessee of real property is competent to give opinion testimony as to the rental value of the leased premises" following the owner-opinion rule).

The father argues, however, that even if the son, as co-owner, was entitled to give an opinion as to the fair rental value, he gave such an opinion for only the last two years (1990–1991) and there is no evidence of the fair rental value from 1981 to 1989. There is merit to this argument.

Based on his efforts in "the last two, three years * * * looking around for rental properties for warehousing" in the area, the son testified on direct examination that the rental value of the properties ("if I had to put a figure on it"): "I would say $2.00 per square foot." This translated to $15,000 annual rental for each of the two properties. On cross-examination, however, the son disclaimed any knowledge of rental value for the earlier years:

"Q. Now, where did you come up with this $2.00 per square foot? Where did you come up with this figure of $2.00 per square foot?

"A. I was looking for real estate in the area for warehousing for the business that I'm conducting now and I found in the area to be asking rents, et cetera, leases, anywhere from $1.75 to $3.75 a square foot. And that's warehousing space that I have been looking at, not commercial type frontage property.

"Q. And that's just recently, correct?

"A. Within the last two years.

"Q. Well, do you know what it was going for in 1981[?]

"A. I have no idea because I wasn't looking for leases at that point.

"Q. How about 1982?

"A. I don't know.

"Q. '83?

"A. I don't know.

"Q. '84?

"A. The area hasn't changed much, I have to believe it would probably remain pretty stable.

"Q.  You really don't know what that property was going for or what the leases would be, what a fair market value for that rent would be back in 1981, '82, '83 or '84, is that correct?  You really don't know?

"A.  I have nothing to document it, but like I said before, the area is pretty stable and it would have—

"Q.  What about for 1985?

"A.  Any of them years.

"Q.  Up until just recently, the last two years, is that correct[?]

"A.  Correct.

"Q.  So you really don't know actually what you're entitled to in rent if you're entitled to anything, is that correct?  You really don't know what you're entitled to?

"A.  Correct.  I only gave a fair scenario."

We can find no other evidence in the record as to the fair rental value of the properties in question.  Given this state of the evidence, we are compelled to find that the maximum rental value to which the son was entitled as a setoff, had his claim been submitted to the jury was $30,000, which is one half of the total rental value of the two properties ($60,000) for the years 1990 and 1991.

This assignment of error is sustained in part and overruled in part.

"II.  The court erred in failing to provide an appropriate jury instruction with respect to the appellant's right to the reasonable rental value for his interest in the jointly held property used exclusively by the appellee and as to the right to an offset to appellee's claim for damages."

Consistent with the previous discussion, we also hold that the trial court erred in failing to give any instruction to the jury on the question of the son's entitlement as a setoff to the father's damages of one half of the fair rental value for the use and enjoyment of the property.  Since the issue had been tried by the parties, the son was entitled to a jury instruction either as part of a counterclaim submission or as a setoff to the father's damages, at least to the extent of $30,000 for the years 1990 and 1991.  This was appropriately requested but improperly denied.  Given the son's failure to prove what the fair rental value was for the period from 1981 through 1989, we find that any error in failing to give the instruction as to those earlier years was mooted by the failure of proof discussed, *supra*, under Assignment of Error I.

This assignment of error is sustained in part and overruled in part.

"III.  The court erred in failing to dismiss plaintiff's claim for failure to prove damages."

■ The son claims that the father's proof of lost profits was deficient and speculative and the court should have dismissed the father's claims. In this case the amounts the father claimed he was entitled to share had been earned before trial for the years 1975 to 1980. The jury's award as to the father's share finds some credible support in the record and we cannot say that it was any more speculative than the circumstances warranted. The parties agreed, and the jury was instructed, that father and son were each equal owners of a one-half interest in the business and that each was entitled to one half the net profits of the transmission business.

The father's proof of damages in the form of his share of net profits in this case was fraught with difficulty. This was due in large part to the informal and casual "bookkeeping" and admitted underreporting of receipts for tax purposes by the son in the conduct of the transmission business. The task was not made any easier by the fragmentary evidence on which the father had to rely and the extrapolations to which he had to resort because of missing, incomplete and ill-kept records for which the son gave no adequate explanation. Starting with these limitations, we will nevertheless address the scope and quality of the father's evidence.

Ordinarily, the test for proof of lost profits is as set forth in *AGF v. Great Lakes Heat Treating* (1990), 51 Ohio St.3d 177, 181, 555 N.E.2d 634, 638, as follows:

"The general test in the state of Ohio for the recovery of lost profits is set forth in *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883, at paragraph two of the syllabus: 'Lost profits may be recovered by the plaintiff in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.' We further expounded on the third prong of the *Combs* test, stating that '[i]n order for a plaintiff to recover lost profits in a breach of contract action, the amounts of lost profits, as well as their existence, must be demonstrated with reasonable certainty. * * *' *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814, syllabus."

This case is not the usual loss-of-profits case. In most such cases, the plaintiff attempts to prove what profits he *would have made* had the defendant not breached the contract or interfered with his business. In this case, all the profits were *already earned* from the son's operation of the Cleveland Transmission business from 1973 to 1981, but he underreported a substantial part of them on the corporate income tax returns, the logical source of verification. The problem, therefore, was identifying the amount of profits pocketed by the son for purposes

of requiring the son to disgorge one-half thereof. The same reasons for insisting on "reasonable certainty" that is required in the usual loss-of-profits cases, where there is underlying doubt that any profits would have been made, is not applicable here.

It makes more sense in this case to borrow well-accepted principles from tort law which specify that once the *fact of damage* is established with reasonable certainty the plaintiff is given considerable latitude in proving the *amount* of the loss lest the wrongdoer escape his obligation to make restitution. See, generally, 25 Corpus Juris Secundum (1966), Damages, Section 28. See, also, Judge Nahra's concurring opinion in *Kinetico, Inc. v. Indep. Ohio Nail Co.* (1984), 19 Ohio App.3d 26, 33, 19 OBR 92, 99, 482 N.E.2d 1345, 1353 ("[T]he 'reasonable certainty' requirement applies only to the cause or fact of damages and not to the amount of damages.* * * Mathematical precision, therefore, is not required.").

The leading United States Supreme Court case on the subject, *Story Parchment Co. v. Paterson P. Paper Co.* (1931), 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, held that once an antitrust plaintiff has proved that the defendant's conduct caused him some loss, the amount of the loss could be determined by the jury from the available data as a matter of just and reasonable inference even though the result was only approximate. In other words, it is the defendant and not the injured party who must bear the risk of uncertainty that the defendant's conduct has occasioned. *Id.* at 562–565, 51 S.Ct. at 250–251, 75 L.Ed. at 548–549. The same principle was carried forward and reaffirmed in *Bigelow v. RKO Radio Pictures* (1946), 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, where the court said:

"In each case we held that the evidence sustained verdicts for the plaintiffs, and that in the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs. In this we but followed a well settled principle. See *Hetzel v. Baltimore & O.R. Co.*, 169 U.S. 26, 38–39 [18 S.Ct. 255, 259–260, 42 L.Ed. 648, 652]. The tortious acts had in each case precluded ascertainment of the amount of damages more precisely, by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions. Nevertheless, we held that the jury could return a verdict for the plaintiffs, even though damages could not be measured with the exactness which would otherwise have been possible.

"In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guess work. But the jury may make a just and reasonable estimate of the

damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act on probable and inferential as well as upon direct and positive proof.' *Story Parchment Co. v. Paterson Parchment Paper Co.* [282 U.S. at 561–564, 51 S.Ct. at 250–251, 75 L.Ed. at 547–549], *Eastman Kodak Co. v. Southern Photo Materials Co.* [273 U.S. 359 at 377–379, 47 S.Ct. 400 at 404–405, 71 L.Ed. 684 at 690–691]. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

"The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

" * * *

"The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery for a proven invasion of the plaintiff's rights."

The *Bigelow* principles were repeated and reaffirmed in *J. Truett Payne Co. v. Chrysler Motor Corp.* (1981), 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442, 450, and have been frequently and broadly applied in many jurisdictions: *Kenford Co. v. Cty. of Erie* (1985), 489 N.Y.Supp.2d 939, 944, 108 A.D.2d 132, 137; *Spangler v. Helm's New York–Pittsburgh Motor Exp.* (1959), 396 Pa. 482, 484, 153 A.2d 490, 492; *Godwin v. Ace Iron & Metal Co.* (1965), 376 Mich. 360, 368, 137 N.W.2d 151, 154; *Tri–County Grain Terminal Co. v. Swift & Co.* (1970), 118 Ill.App.2d 313, 320–323, 254 N.E.2d 311, 315–316; *McKenna v. Begin* (1977), 5 Mass.App. 304, 311, 362 N.E.2d 548, 553; *Dallman v. S. Heater Co.* (1968), 262 Cal.App.2d 582, 593, 68 Cal.Rptr. 873, 880; *Olivetti Corp. v. Ames Business Sys., Inc.* (1986), 81 N.C.App. 1, 18, 344 S.E.2d 82, 90–91.

The application of these principles to the case at hand is all the more appropriate because the son, in operating the transmission business, whether it was a close corporation or a partnership, owed the father a heightened fiduciary duty of the utmost good faith and integrity and was obliged to refrain from taking advantage of his position at the expense of his partner. *Gigax v. Repka* (1992), 83 Ohio App.3d 615, 623, 615 N.E.2d 644, 649.

The father produced evidence that the son, for the years 1975 through 1979, inclusive, paid himself salaries and took out loans from the business which amounted to funds totaling $118,601. The son, when confronted with this

evidence on cross-examination, never denied that he received these funds, including loans, in lieu of salaries, that were never repaid. Although the father did not consent to these payments, we do not find he was entitled to one half of the salaries and loans taken by the son from the business. There is no evidence that they were excessive. Nor was there evidence that the father worked in the business during this period and was entitled to a salary or loans in lieu of salary. His fifty-percent ownership of the business did not entitle him to salary which he never earned.

However, the father claimed other damages based upon evidence that the son underreported at least one half of the receipts of the business. The son did not file tax returns for the years 1980 and 1981. The father found and submitted evidence that in one month of 1980 there were receipts of $12,156.52 and for a period covering only *one-half* the year of 1981 the father introduced receipts totaling $68,913.02. The son testified that 1981, the last year in which he operated the business, was an average year. Yet the highest amount of gross receipts ever reported by the son for any one *entire year* was $68,484.49 in 1978. The father also introduced receipts from one month in 1979 totaling $7,435.73, which receipts were excluded from the tax reporting for that year. From these revelations, it would not be unreasonable to conclude that at least one half of the gross receipts of the business (an average of $60,000 per year) was underreported by the son for the period in question. Due to the extreme size and magnitude of this underreporting, arguably the father was owed $30,000 per year for the six years, or the sum of $180,000. Thus, the $100,000 verdict was within the reasonable range of the evidence.

Whether the son was acting in the capacity as a partner of the business or as an officer of a close corporation, in either case he owed a *fiduciary duty* to his father and his breach of that fiduciary obligation was a tort rendering the son liable for the damages proximately caused by his unfaithful conduct. If there was uncertainty as to precise amount of the damages, it was the son's own wrongdoing that contributed to the uncertainty.

Therefore, we find there was sufficient evidence to support the jury's verdict of $100,000 before any setoffs in favor of the son.

This assignment of error is overruled.

"IV. The court erred in failing to dismiss plaintiff's claim for failure to join a proper party."

The son contends that the judgment against the son was incorrect on the grounds that any judgment should have been rendered against the AAA Cleveland Transmission Services, Inc. and that said defunct corporation was not joined as a party to this action. The son never asserted this defense in his answer to

the complaint or at the trial of this cause. In accordance with Ohio Civ.R. 12(H)(2), a defense of failure to join an indispensable party under Civ.R. 19 must be made in a pleading, in a motion for judgment on the pleading, or at the trial on the merits. The appellant has waived the right to assert failure to join the corporation as a defense to the action. *Layne v. Huffman* (1975), 42 Ohio St.2d 287, 71 O.O.2d 260, 327 N.E.2d 767, syllabus.

Even if the son had not waived the indispensable party defense, the judgment against the son was still proper, since the father's claim was based on the theory that father and son were co-owners of the Cleveland Transmission business, each entitled to one half of the net profits and it was the son who pocketed the father's one half. The parties failed to observe appropriate corporate formalities and treated the corporate form as a convenience for tax purposes.

This assignment of error is overruled.

█ Since we have decided that the trial court erred in dismissing the son's counterclaim and in not instructing the jury on defendant's claim for rental value under Assignments of Error I and II, we must return this case to the trial court on the issue of damages. Before that is done, we propose a disposition of the case which may serve the interests of justice and the parties while effecting judicial economy.

This court has the same power to order a remittitur as does the trial court. *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph five of the syllabus; *Duracote Corp. v. Goodyear Tire & Rubber* (1983), 2 Ohio St.3d 160, 162, 2 OBR 704, 706, 443 N.E.2d 184, 186. It is not necessary that the excess to which the remittitur is addressed be susceptible to exact computation. *Schendel v. Bradford* (1922), 106 Ohio St. 387, 140 N.E. 155.

Therefore, this court modifies and affirms the award of damages below upon condition that the plaintiff-appellee accepts a remittitur from $100,000 to $70,000 with interest at the statutory rate from the date of the original judgment. Plaintiff-appellee shall have ten days from the announcement of this decision to file an acceptance of this remittitur. If plaintiff-appellee refuses or fails to accept the remittitur within the time allotted, the judgment below is reversed and remanded to the trial court for a new trial on the issues of damages to which each party is entitled consistent with the principles enunciated in this opinion.

*Judgment accordingly.*

PATTON, P.J., and BLACKMON, J., concur.