35 F.3d 566
 1994-2 Trade Cases P 70,711
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
SILVER CLOUD, INC., Plaintiff-Appellee,
v.
QUIKUT DIVISION OF SCOTT FETZER COMPANY, Defendant-Appellant.
 No. 92-4373.
 United States Court of Appeals, Sixth Circuit.
 Aug. 26, 1994.
 
 Before: RYAN and NORRIS, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 The defendant, Quikut Division of Scott Fetzer Co., appeals the district court's denial of its motion for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(b), in this action alleging that the defendant violated federal antitrust laws and breached its distributorship contract with the plaintiff, Silver Cloud, Inc. The district court dismissed the plaintiff's antitrust claims on directed verdict, submitting only the contract claim to the jury, which returned a verdict in the plaintiff's favor.
 
 
 2
 On appeal, the defendant raises four issues: (1) Where the plaintiff pleaded, but failed to prove, the defendant's motive for breach, did the district court err in denying the defendant's Rule 50(b) motion? (2) Did the district court err in instructing the jury on the impact the court's directed verdict on the antitrust claims had on the plaintiff's contract claim? (3) Did the plaintiff's evidence at trial sufficiently establish its performance of the contract? (4) Did the plaintiff adequately prove damages flowing from the breach of contract?
 
 
 3
 We find all of the defendant's points of error without merit, and affirm the district court's order of judgment.
 
 I.
 
 4
 Reluctantly, we must burden our opinion with an extensive discussion of the facts in order to adequately explain our disposition of the issues.
 
 
 5
 The plaintiff's primary business is the manufacture and marketing of plastic injection-molded products, including plastic household containers and window components. The plaintiff's president and sole shareholder is Stephen Motosko II, who, in addition to his interest in the plaintiff, has long operated as a pitchman selling products for the defendant and others at consumer shows and flea markets. The defendant's primary product in this market is the AN-800 knife, which is sold under such trade names as the "Ginsu Knife" or "The Blade."
 
 
 6
 In 1983, Motosko approached the defendant with an invention he planned to patent, a manually-operated vegetable slicer. Motosko considered his slicer to be an improvement over the only comparable slicer on the market, the Combi-Chef, which was manufactured by "Ruby" Morris of National Kitchen Products. After initial negotiations with the defendant, Motosko prepared blueprints to accommodate his slicer to the unique dimensions of the defendant's AN-800 knife, and applied for a patent. According to Motosko's trial testimony, the defendant's sales manager, Edward Ellis, and general manager, Steve Valliant, told Motosko that the defendant's marketing studies demonstrated that the defendant could sell 300,000 of Motosko's proposed slicers annually through demonstrations, and up to 1 million slicers per year through television sales.
 
 
 7
 The negotiations between Motosko, Ellis, and Valliant culminated in a distributor agreement, signed on February 24, 1984, between the defendant and the plaintiff. The agreement provided that the defendant was to be the exclusive distributor of the slicer for two years. During the life of the contract, the defendant was to purchase 50,000 slicers each year at a cost of $1.75 per unit, exclusive of blades, which the defendant was to supply. However, the defendant's failure to purchase the requisite 50,000 slicers the second year of the contract would result only in loss of exclusivity. The agreement also provided that the defendant was to use its best efforts to promote the interest and business of the plaintiff. The plaintiff, on the other hand, warrantied the slicers to be free from defects in material and workmanship, and merchantable and fit for their intended purpose. Either party could terminate the contract for cause upon 30 days written notice. In addition, the agreement contained a general prohibition on assignment.
 
 
 8
 Mass production of the slicer required the plaintiff to purchase a heat-treated insert mold at a cost of approximately $80,000. In order to purchase the mold, Motosko secured a loan from the Dollar Bank of Niles, Ohio, by assigning the plaintiff's proceeds under the distributor agreement. Before signing the loan agreement, Motosko notified Valliant of the intended assignment.
 
 
 9
 By the latter part of 1984, the plaintiff was ready to test-market the slicer. After discussing the matter with Ellis, Motosko booked booth space at a December 1984 trade show in Detroit, Michigan, and at a January 1985 home show in Philadelphia, Pennsylvania. About this same time, Ellis reported to Motosko that he had met with "Ruby" Morris, who was the defendant's largest customer. According to Motosko's trial testimony, Ellis had met with Morris in order to learn whether Morris objected to the defendant's marketing of the plaintiff's slicer, in competition with Morris's Combi-Chef. Motosko was furious that Ellis had informed the competition of the slicer, and complained to David Bryant, who had replaced Valliant as the defendant's general manager. Bryant promised to resolve the situation.
 
 
 10
 Shortly after Motosko's conversation with Bryant, the defendant demanded that the plaintiff procure $5 million in liability insurance, without which the defendant would not market the slicer. Under protest, the plaintiff paid approximately $2,000 to obtain the requisite insurance, and proceeded to test-market the slicer at the Detroit show as scheduled.
 
 
 11
 Test-marketing at the Detroit show was, in Motosko's opinion, successful. However, while setting up the plaintiff's booth at the Philadelphia show, Charles Motosko, Stephen Motosko's brother, was approached by Morris, who asked what Charles Motosko planned to sell. When Charles Motosko responded that he intended to market the plaintiff's slicer, Morris responded that the defendant would not allow it. After phone calls between and among Morris, Motosko, Charles Motosko, and Ellis, Motosko instructed his brother to close the booth.
 
 
 12
 A few days later, on February 4, 1985, the defendant notified the plaintiff that it was activating the distributor agreement, formally invoking the defendant's exclusivity arrangement. However, the defendant did not order enough slicers to supply even its own distributors, nor did the defendant prepare advertising or begin television marketing efforts.
 
 
 13
 On this basis, Motosko, Charles Motosko, and another demonstrator, Richard Reese, began demonstrating the slicer themselves, which required buying the slicers from the defendant. As Motosko testified at trial, Bryant agreed to sell Motosko the plaintiff's slicers to market at those trade shows that Morris did not plan to attend.
 
 
 14
 Shortly thereafter, the defendant demanded that the plaintiff alter the slicer, requiring the expenditure of approximately $17,000 in order to reconfigure the manufacturing mold. The plaintiff altered the mold as requested, but, according to the defendant, the slicer never performed as anticipated under the agreement. By letter dated September 11, 1985, the defendant terminated the distributor agreement on the ground that the product was not merchantable.
 
 
 15
 Motosko, Charles Motosko, and Reese continued efforts to market the slicer, purchasing the AN-800 knives directly from the defendant. However, after a heated exchange over pricing between Charles Motosko and Morris at a January 1987 home show, the defendant refused to continue supplying knives to Motosko or his brother.
 
 
 16
 Reese, on the other hand, continued to purchase the AN-800 knife from the defendant, and used it to market the plaintiff's slicer until February 1988. At that time, at the New Orleans trade show, one of the defendant's employees asked Reese what he was selling. Shortly thereafter, Reese received a letter from the defendant terminating his account. The defendant reinstated Reese's account upon his promise not to market the plaintiff's slicer. However, when the defendant learned that Reese was marketing the slicer despite his promise, it again terminated Reese's account. The defendant also terminated the account of another demonstrator, James Frenier, in 1989, because it believed Frenier was selling the plaintiff's slicer. While Motosko, Reese, and Frenier marketed the slicer after this time, they were forced to do so using a knife that was ill-fitted to the design.
 
 
 17
 In September 1989, the plaintiff filed an eight-count complaint against the defendant and Morris, but pursued only two antitrust counts and the breach of contract count at trial. Prior to submitting the case to the jury, the district court granted the defendant's Fed.R.Civ.P. 50(a) motion for judgment as a matter of law as to the two antitrust counts. The court also dismissed Morris as a party. The court then submitted the breach of contract claim to the jury, with an instruction that the jury could consider evidence relating to the antitrust claims only insofar as the evidence was probative of the contract claim. The jury returned a verdict in the plaintiff's favor, awarding general damages totalling $70,000. After the verdict was reduced to final judgment, the defendant renewed its motion for judgment as a matter of law, pursuant to Rule 50(b), or in the alternative moved for a new trial. The district court denied the motion on November 16, 1992. The defendant's timely appeal followed.
 
 II.
 
 18
 We review Rule 50(b) motions for judgment as a matter of law pursuant to the same standard applied to "the forerunner to this motion, the motion for judgment notwithstanding the verdict." Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir.1994). Because state substantive law is controlling where, as here, the claim was before the district court on pendent jurisdiction, see United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966), the Rule 50(b) motion is governed by state law. Bank of Cumberland v. Aetna Cas. & Sur. Co., 956 F.2d 595, 597 (6th Cir.), cert. denied, 113 S.Ct. 204 (1992). Accordingly,
 
 
 19
 Under the test in Ohio, ... an issue is in the province of the jury "when there is sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue...." The test is not whether the trial judge would grant a new trial on the weight of the evidence.
 
 
 20
 Moran v. Johns-Manville Sales Corp., 691 F.2d 811, 813 (6th Cir.1982) (citations and footnote omitted).
 
 III.
 A.
 
 21
 Because the plaintiff alleged that antitrust considerations motivated the defendant's breach, the defendant argues that the plaintiff's contract claim was predicated on the success of its antitrust claims. Thus, contends the defendant, once the district court found that there was insufficient evidence to submit the antitrust claims to the jury, it should have entered judgment for the defendant on the contract claim as well.
 
 
 22
 In order to adequately plead a breach of contract action under Ohio law, the plaintiff need set forth only the following elements:
 
 
 23
 (1) the terms of the contract, (2) the performance by the plaintiff of his obligations, (3) the breach by the defendant, (4) damages, and (5) consideration.
 
 
 24
 American Sales, Inc. v. Boffo, 593 N.E.2d 316, 321 (Ohio App.1991). As the Ohio Supreme Court stated a long time ago, a plaintiff's claim of breach is not insufficient merely because he pleaded, then failed to prove, unnecessary facts. Gartner v. Corwine, 48 N.E. 945, 945 (Ohio 1897). Accord Cusack v. De Witt-Jenkins Realty Co., 149 N.E.2d 924, 926 (Ohio App.1957).
 
 
 25
 The gist of the defendant's first assignment of error is that the plaintiff did not allege a mere breach of contract, but rather alleged a breach motivated by the defendant's conspiracy with Morris, in violation of federal antitrust laws. However, the plaintiff was under no obligation to plead or prove the defendant's motive for breaching the contract. Motive is not an element of a breach of contract action in Ohio. See Boffo, 593 N.E.2d at 321. The fact that the plaintiff pleaded motive, in addition to the requisite elements of an action for breach, then failed to prove motive, did not require the district court to enter judgment in favor of the defendant. Accordingly, the defendant's first claim of error is without merit.
 
 B.
 
 26
 The defendant next argues that the district court was required to instruct the jury that the antitrust claims had been resolved in the defendant's favor. According to the defendant, the district court's failure to do so confused the jury as to which facts it could consider, thus requiring reversal of the verdict.
 
 
 27
 The question before a reviewing court determining the propriety of challenged jury instructions in a civil trial, is whether the instructions "[t]aken as a whole ...," are an adequate representation of the law. Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 921 (6th Cir.1984). See also Rimer v. Rockwell Int'l Corp., 739 F.2d 1125, 1128 (6th Cir.1984). In addition, the Federal Rules of Civil Procedure expressly provide that our role in reviewing jury instructions is conditional:
 
 
 28
 No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.
 
 
 29
 Fed.R.Civ.P. 51. "Strict compliance with Rule 51 is required and failure to state specific grounds [for objection] is fatal." Rimer, 739 F.2d at 1127.
 
 
 30
 Here, the district court began its jury instructions by notifying the jury that they were not to consider the antitrust claims during deliberations:
 
 
 31
 During the period of your absence the antitrust issues have been resolved. They will not be before you for your consideration. The remaining issue for your determination will be the claim of plaintiff for breach of contract. You are instructed now that in reaching your verdict in this case you shall consider only that evidence introduced during trial which relates to the issue given to you for your decision. You may consider any evidence adduced and relating to the antitrust issues only, and [sic] if this evidence bears on the issuing [sic] of breach of contract which is to be the subject of your verdict in this case.
 
 
 32
 In addition, the district court correctly instructed the jury on the elements of a contract breach, and gave comprehensive instructions regarding the standards by which the jury was to determine whether the plaintiff had adequately established these elements. Thus, taken as a whole, the district court's instructions sufficiently advised the jury of the claim it was to consider.
 
 
 33
 Moreover, in violation of Fed.R.Civ.P. 51, the defendant--to date--has not identified the basis for its contention that the district court should have informed the jury that the antitrust claims had been resolved in the defendant's favor. The Federal Rules certainly do not require such an instruction. In entering judgment as a matter of law, the district court holds only that a plaintiff has not proved its claim, not that the defendant is factually blameless. Nor does any authority cited by the defendant support its position. While the district court's instruction certainly could have been phrased more artfully, the defendant did not object to the form of the instruction. Accordingly, we reject the defendant's second claim of error.
 
 C.
 
 34
 Next, the defendant maintains that the plaintiff failed to prove its performance under the contract, because the plaintiff never provided the defendant with a merchantable product and because the plaintiff assigned the contract in violation of an express prohibition in the agreement. We conclude that the plaintiff produced sufficient evidence of its performance to submit both issues to the jury. Accordingly, the defendant was not entitled to judgment as a matter of law.
 
 
 35
 First, as to the plaintiff's failure to provide a merchantable product, the plaintiff's duty under the contract was to provide an exclusive distributorship to the defendant for "a food slicer into which is inserted a slicing knife which then becomes the cutting edge of the device." In addition, the food slicer was to be "suitable for the slicing of fruits, vegetables, and other food products."
 
 
 36
 The jury heard the testimony of Reese and Frenier that they both had sold the plaintiff's slicer, that it was a good product, and that it was suitable for slicing vegetables. In addition, Motosko demonstrated the product for the jury. Given this evidence, the district court properly submitted to the jury the question of whether the plaintiff fulfilled its duty to supply a merchantable product.
 
 
 37
 As to the defendant's claim that the plaintiff breached the contract by assigning proceeds, it is uncontested that the distributor agreement contained a general prohibition on assignment. However, under Ohio law, the effect of such a clause is to forbid assignment only of contract duties, not rights. Ohio Rev.Code Ann. Sec. 1302.13(C). Here, the jury heard Motosko's testimony that he informed Valliant of the assignment before agreeing to it, and that Valliant lodged no objection.
 
 
 38
 Accordingly, as with the issue of merchantability, the plaintiff presented sufficient evidence to submit the assignment issue to the jury.
 
 D.
 
 39
 Finally, the defendant argues that, in order to prove lost profits, the plaintiff had to demonstrate with certainty the amount of such damages. According to the defendant, the plaintiff failed to adequately prove the cost of its performance, and thus failed to meet the requisite certainty standard.
 
 
 40
 The Ohio Supreme Court has adopted a three-pronged test in order to ascertain the propriety in any particular case of an award of lost profits:
 
 
 41
 "Lost profits may be recovered ... in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty."
 
 
 42
 City of Gahanna v. Eastgate Properties, Inc., 521 N.E.2d 814, 817 (Ohio 1988) (citation omitted). The reasonable certainty standard applies to both the fact and the amount of the alleged lost profits. Id. at 818.
 
 
 43
 Substantial certainty requires "more than a conclusory statement as to the amount of lost profits." Rhodes v. Rhodes Indus., Inc., 595 N.E.2d 441, 448 (Ohio App.1991). Rather, the plaintiff must substantiate the claimed amount by placing in evidence facts "with respect to overhead costs or a breakdown of expenses, parts, labor, etc." Id. at 449. Using this standard, the Rhodes court rejected a plaintiff's summary statement that he operated at a 25% profit margin. Id. Similarly, another Ohio appellate panel rejected a plaintiff's profit calculation that took into account only its direct operating expenses. Kinetico, Inc. v. Independent Ohio Nail Co., 482 N.E.2d 1345, 1350 (Ohio App.1984) (quoting R. Dunn, Recovery of Damages for Lost Profits 2d 223, Sec. 5.4 (1981)).
 
 
 44
 Here, the plaintiff established lost profits with the certainty required by Ohio law. Motosko detailed the plaintiff's costs per unit, including materials, overhead, insurance, and depreciation. The distributor agreement itself set forth the number of units the defendant had agreed to purchase, as well as the agreed price per unit. Thus, the jury had an adequate factual basis on which to calculate an award of lost profits. Indeed, the jury's award conforms precisely with the plaintiff's anticipated profits during the first year of the contract.
 
 
 45
 The defendant argues, however, that the plaintiff failed to prove damages because it based its calculation on a faulty formula. It is true that Motosko at one point testified, rather equivocally, that his initial profit projections contemplated selling 300,000 units per year. However, Motosko elsewhere testified that he anticipated selling 50,000 units the first year of the contract, at a profit of $1.40 per unit and a total profit of $70,000, regardless of the plaintiff's performance in subsequent years. Given this conflicting testimony, it was for the jury to determine which evidence to accept. The jury obviously chose the latter explanation. Given the jury's advantage in having the opportunity to judge the credibility of all the testimony, we may not disturb its choice.
 
 
 46
 Accordingly, the defendant's fourth claim of error is without merit, and the district court properly denied the defendant's Rule 50(b) motion.
 
 IV.
 
 47
 We AFFIRM the district court's order of judgment.