JOURNAL ENTRY AND OPINION
This is an appeal from a jury verdict following a trial before Visiting Judge Norman A. Fuerst that awarded compensatory and punitive damages and a post-judicial award of attorney fees to appellee/cross-appellant Dr. Frederick Harris, M.D. Inc. ("Harris") on its claims of tortious interference with contract and breach of contract against appellants University Hospitals Health Systems, Inc, University Hospitals of Cleveland and University Primary Care Practices, Inc. ("UPCP"), (collectively, "UH"), and Thomas L. Craig, M.D. We affirm in part, reverse in part, modify the jury award, vacate the award of attorney fees and remand.
Dr. Harris and his corporation, Dr. Frederick Harris, M.D., Inc. ("Harris"), employed Dr. Craig in his medical practice from 1990 to August 1994. Sometime in 1991, the parties executed a contract with non-competition and non-solicitation clauses, under which Dr. Craig would be paid $80,000 a year in addition to benefits, and a company car. The non-competition provision stated:
 "Employee shall not, at any time during the term of this agreement and for a period of two (2) years thereafter, without the prior written consent of the corporation, engage in the practice of medicine within 5 miles of any office operated by the Corporation."[1]
The non-solicitation clause provided:
 "Employee shall not at any time during the term of this Agreement and for a period of two (2) years thereafter, without the prior written consent of the Corporation, directly or indirectly, induce or attempt to induce any employer, agent, or patient of the Corporation to terminate his or her relationship with the Corporation nor shall employee in any way directly or otherwise interfere with such relationship."[2]
This employment agreement had no specific termination date but provided various ways for the parties to affirmatively end the relationship.
Later they agreed that Dr. Craig would have the opportunity to purchase a one-half interest in the practice, subject to a due diligence evaluation for price. In an addendum to the employment agreement, the parties memorialized this arrangement and indicated that such purchase price would be determined by September 30, 1992. Because of delays in assembling financial data for the price evaluation, the parties executed another extension of the contract, which contained a clause stating that the "employment agreement" would terminate on December 31, 1992.
The purchase agreement was never executed but the parties continued to work together as they had before, except that Dr. Craig's compensation changed from a flat salary to a share of profits based on productivity, as if he were already a partner. He earned about $153,000 for 1993 but received nothing during the first quarter of 1994 because of what Dr. Harris termed a lack of productivity.Thereafter, the parties agreed that Dr. Craig would receive a monthly stipend of no less than $2,500, regardless of productivity.
In April 1994, Dr. Harris contacted Cliff Coker, the CEO of UPCP, a University Hospitals subsidiary that purchased physician practices, about selling the Harris practice and employing him and Dr. Craig in the hospital's network of primary care physicians. According to Dr. Harris, he proposed an "all or nothing" deal: that UH would purchase the practice and employ them both, or not buy it and employ neither physician. Dr. Harris also informed Coker of Dr. Craig's non-competition and non-solicitation agreements with the Harris practice.
Throughout May and June 1994, Coker and Dr. Michael Nochomovitz, the Medical Director of UPCP, together discussed employment with Dr. Harris and Dr. Craig, individually. Both Drs. Craig and Harris repeatedly advised Coker and Dr. Nochomovitz of the non-competition and non-solicitation clauses in the employment agreement that Dr. Craig had signed with the Harris practice.
In late June 1994, UH offered to employ Dr. Craig and his wife, Dr. Kaye Myton-Craig, and informed Dr. Harris that it would not purchase his practice. Dr. Craig resigned from the Harris practice on July 8, 1994, and stopped working there on August 4, 1994. As these events unfolded, Dr. Harris reminded both Dr. Craig and UH by letter of the non-competition and non-solicitation provisions in Dr. Craig's employment agreement, and each agreed to abide by those restrictions.
Beginning September 1, 1994, UH placed Drs. Craig and Myton-Craig in offices in the Parkway Medical Center on Park East Drive in Beachwood, either 4.6 or 4.8 miles away from the Harris offices in the Severance Medical Arts Building in Cleveland Heights. When Dr. Harris, through his lawyer, informed UH that it had violated the non-competition terms by failing to observe the five-mile geographical restriction, UH responded that it would need formal proof of any violation and, according to Dr. Harris and his lawyer, threatened to move Dr. Craig into an office at Severance upon expiration of non-competition limitation if Harris insisted that it move Dr. Craig from the Parkway office.
After Dr. Harris had a survey that revealed the Parkway Building was 4.6 miles away from Severance, UH acknowledged a technical violation (asserting only a 4.8 mile distance) and promised to promptly move Dr. Craig. Although it was not clear when Dr. Craig moved to an office in Bedford, Ohio outside of the five-mile zone, Dr. Harris claimed it was not until sometime in November 1994.
While these issues were being debated between the parties, UH placed advertisements in area newspapers during September and October 1994, announcing the establishment of the Craig/Myton-Craig practice at the Parkway Medical Building. Additionally, in Mid-October, 1994, it bulk-mailed approximately 35,000 postcards to zip codes in the immediate vicinity of both Parkway and Severance that advertised the new Craig/Myton-Craig Practice at that location. Dr. Harris had evidence that Dr. Craig, while still employed in the Harris practice, had unsuccessfully solicited two patients to follow him to his new practice. Significantly, Dr. Nochomovitz, who asserted he never became personally involved in the mechanics of setting up new UH doctor practices, sent a letter to Harris' answering service directing it to refer all calls to Dr. Craig to his Parkway office number, and asserting that the reason Drs. Craig and Harris were no longer associated was because the Harris practice had been "dissolved."
Dr. Harris claimed, as a result of these actions by Dr. Craig and the UH, the Harris practice lost 216 patients to the Craig-UH practice, documented by patient record-transfer forms. Additionally, Dr. Harris claimed to have lost another 346 patients, although he could not confirm that these patients actually went to Dr. Craig because none had submitted a record-transfer request.
On October 17, 1994, Dr. Harris and his corporation brought suit claiming, among other things, breach of contract by Dr. Craig and tortious interference with contract by UH.[3] Harris' request for a preliminary injunction and temporary restraining order were denied. Following a two-week trial commencing April 2, 1999, the jury returned a verdict awarding Harris $313,453 in compensatory damages against UH on its tortious interference claim, $75,000 against Dr. Craig on its breach of contract claim, and $200,000 in punitive damages against UH. Thereafter, the judge denied Dr. Craig's and UH's motion for JNOV or a new trial and awarded Harris $140,000 in attorney's fees.
UH asserts fourteen assignments of error, and Harris asserts two cross-assignments in a separately perfected appeal.[4]
 I. THE TRIAL COURT ERRED WHEN IT DETERMINED THAT THE RESTRICTIVE COVENANTS WERE IN EFFECT UNTIL AUGUST 4, 1996. THE WRITTEN EMPLOYMENT AGREEMENT AND EXTENSION THERETO ENDED DECEMBER 31, 1992, AND THEREFORE, AT MOST, THE EFFECT OF THE NON-SOLICITATION AND NON-COMPETE CLAUSES LASTED ONLY TWO YEARS AFTERWARD, EXPIRING ON DECEMBER 31, 1994.
UH argues that the contract provisions that Harris asserts against it are either unenforceable or, as a matter of law, the judge erroneously held that each commenced on August 4, 1994, when Dr. Craig physically ended his relationship with the Harris practice. UH argues that because the employment agreement between Dr. Craig and Harris expressly expired on December 31, 1992, the "two years after" time period contained in the restrictive clauses began to run at that date and would have been enforceable only through December 31, 1994. Harris counters that although the agreement expired by its own terms on December 31, 1992, the parties' continued employment relationship effectively tolled the time period of the agreement, and that the "two years after" time periods commenced only when Dr. Craig terminated the employment.
"Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement.[5] Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions.[6] When the terms in a contract are unambiguous, courts will not create a new contract by finding an intent not expressed in the clear language employed by the parties.[7]"[8]
Against this bedrock of general law governing the construction of contracts, we are mindful of the principle which states that restrictive covenants should be strictly construed. This principle is founded on the historical disfavor of restrictive covenants in employment agreements in general,[9] which, as applied to physicians, are disfavored because such restrictions may operate to deny the general public crucial access to medical care.[10]
Consequently, although careful to strictly apply the restrictive covenants at issue, we must also give plain meaning to the words used by the parties in forming their agreement. By the plain language of the extension to the employment agreement executed in 1992, the agreement "shall terminate December 31, 1992." Additionally, the parties agreed that all clauses in the original employment agreement that had not been specifically altered by the extension "* * * shall remain in full force and effect through December 31, 1992." As such, we hold that the restrictive covenants forming the basis for the case sub judice expired by their very terms on December 31, 1992, yet were subject to enforcement for two years thereafter, or December 31, 1994. This assignment of error has merit, the effects of which will be discussed infra.[11]
 II. THE TRIAL COURT ERRED IN FAILING TO PROPERLY DETERMINE WHETHER THE RESTRICTIVE COVENANT CONTAINED IN THE EMPLOYMENT AGREEMENT WAS REASONABLE AND IN FAILING TO INSTRUCT THE JURY THAT RESTRICTIVE COVENANTS INVOLVING PHYSICIANS SHOULD BE STRICTLY CONSTRUED IN FAVOR OF PROFESSIONAL MOBILITY AND ACCESS TO MEDICAL CARE AND FACILITIES.
Here UH argues that the judge usurped the role of the jury in determining that the covenants at issue were reasonable as that is defined in case law, and that the jury should have been instructed that medical employment contracts containing such restrictions are subject to close scrutiny because public policy favors professional mobility and public access to medical care.
A non-competition clause in an employment agreement may only be enforced to the extent that it is reasonable. Such clauses are only reasonable if the restraint: (1) is no greater than is required for the protection of the employer; (2) does not impose undue hardship on the employee; and, (3) is not injurious to the public.[12] Each case is to be decided upon its own facts.[13]
In the case sub judice, however, UH presented no evidence whatsoever to indicate that the restrictive clauses at issue were not reasonable. No argument can realistically be made that the restrictions found in the non-competition and non-solicitation clauses were greater than that required for the protection of the Harris practice, either in terms of geographical limitation or time frame. UH itself requires physicians joining UPCP to sign employment agreements containing five-mile, one-year restrictive covenants. UH employees Coker and Nochomovitz admitted the reasonableness of a five-mile, two-year restriction. A review of some of the many cases in Ohio appellate jurisdictions reveal that, while a two-year restriction on competition or solicitation may not be standard or uniform, depending on the facts of each individual case, it may be permissible.[14] While UH asserts that the jury should have determined whether the limitations contained in Dr. Craig's employment agreement with Harris were no greater than necessary to protect its legitimate interests, it provided no evidence or argument from which a jury could infer any type of unreasonableness.
There was also no demonstration that the enforcement of the restrictive covenants placed Dr. Craig under any undue hardship. UH, a massive, multi-county organization, cannot seriously argue that the only office in which it could place Dr. Craig as a primary care internist was within the five-mile restricted area, where advertisement for his new practice would have raised improper-solicitation issues.
Finally, there can be no argument that the restrictions facing Dr. Craig, and implicating UH, presented an impermissible impediment to the public access for medical care. The cases in Ohio appellate jurisdictions dealing with restrictive employment agreements which have been modified or invalidated based on the potential harm suffered by the public through their enforcement have dealt with either extremely rural areas or highly specialized physicians, whose services in a particular specialty would otherwise be unavailable in a given region.[15] Dr. Craig, while no doubt a fine physician, is an internist and has not claimed to be schooled in a unique field or trained in a particular procedure known only to him or a very limited number of physicians in the Cleveland metropolitan area. As such, there is no evidence in the record to support a claim that public policy demands that Dr. Craig practice medicine in violation of the restrictive covenants.
Since no evidence in the record existed from which a jury could have found the restrictive covenants at issue unreasonable, we find that the omission of this issue for jury review was not error. This assignment of error has no merit.
 III. THE TRIAL COURT ERRED IN NOT GRANTING JUDGMENT IN FAVOR OF DEFENDANT-APPELLANTS PURSUANT TO PROFESSIONAL INVESTIGATIONS AND CONSULTING AGENCY, INC. dba PICA V. KINGSLAND.
In Professional Investigations and Consulting Agency, dba PICA Corp.v. Kingsland ("PICA"),[16] the facts differ completely from the facts in the case sub judice. In PICA, an employee of that corporation signed a written employment agreement containing two-year non-competition and non-solicitation clauses when he was hired and, less than one month later, resigned to pursue other opportunities. He was re-employed by PICA six months later and the parties orally agreed that the employee would abide by the restrictive clauses contained in his previously executed employment agreement. Four months later, the employee resigned a second time, went to work for a competitor and solicited clients with whom he had contact as a PICA employee. In the ensuing lawsuit, PICA sought to enforce the restrictive clauses in the original written agreement but the Tenth District Court of Appeals declined to enforce the restrictions at all under the rationale that restrictive covenants found in employment agreements generally cannot be performed within a year and hence, to be enforceable they need to be in writing to conform to the Ohio Statute of Frauds.[17] An oral agreement to accept the restrictions of a written employment contract that terminated when the employee initially resigned is ineffective should he be rehired.[18] The terms of the new employment agreement, that he could have contact with PICA clients, terminated the written contract that prohibited him from so doing after he initially left PICA's employ, and it ceased to exist.
UH contends that the expiration of Dr. Craig's employment agreement totally terminated the effects of the agreement. We find, however, that the alteration in Dr. Craig's employment status with Harris after December 31, 1992, where he was treated as a partner rather than a salaried employee, did not constitute two separate employments. Without a new written agreement, the period between January 1, 1993 and December 31, 1994 constituted "two years after" the termination of Dr. Craig's employment agreement with Harris.
The non-solicitation clause at issue prohibited Dr. Craig from inducing any patient to discontinue its relationship with the Harris practice, and the non-competition clause prohibits him from independently practicing within five miles of the Harris offices. While these clauses would not logically be enforced while Dr. Craig stayed employed in the Harris practice after December 31, 1992, they would lie dormant and vest Harris with enforceable rights if Dr. Craig left the practice before December 31, 1994. This assignment of error is not well taken.
 IV. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT SUBSTANTIAL PERFORMANCE BY DR. THOMAS CRAIG IN ATTEMPTING TO COMPLY WITH THE NON-COMPETE WOULD OPERATE AS A DEFENSE TO THE BREACH OF CONTRACT ACTION. SINCE BREACH OF CONTRACT IS AN ELEMENT OF TORTIOUS INTERFERENCE, SUCH WOULD OPERATE AS A DEFENSE TO THE TORTIOUS INTERFERENCE CLAIM DIRECTED AGAINST DEFENDANTS-APPELLANTS UNIVERSITY HOSPITALS OF CLEVELAND, UNIVERSITY PRIMARY CARE PRACTICES, INC. AND UNIVERSITY HOSPITALS HEALTH SYSTEMS, INC.
UH submits that by practicing only 0.2 miles within the five-mile restrictive distance specified in the 1992 agreement, Dr. Craig substantially complied with the non-competition restrictions and such compliance is a defense to Harris' claim that it intentionally procured any breach of contract. The concept of substantial compliance, however, is not as a defense but a basis for a claim by a party who may not have completely fulfilled the terms of the contract but has substantially complied with the contract to sue a defendant for breach.[19] No cases dealing with the breach of a restrictive covenant have held that a defendant's technical, though minor, breach of a geographical restriction can affect the enforceability of the provision.
Alternatively, UH submits that the method of computing the distance between the Harris offices at the Severance Building and the Parkway Building is not specified in the agreement and, because the actual driving distance between the two locations is more than five miles, the correct measure of distance to be applied, regardless of the surveyed distance between the two offices would be a jury question.
Case law has been historically uniform in rejecting this theory and in holding that the correct way to measure the distance between locations is "as the crow flies," or the straight-line approach used by a surveyor.[20] This assignment of error is not well taken.
 V. THE TRIAL COURT ERRED IN NOT DIRECTING A VERDICT IN FAVOR OF DEFENDANT-APPELLANTS ON THE CLAIM THAT DR. CRAIG BREACHED THE NON-SOLICITATION CLAUSE WHILE EMPLOYED BY UNIVERSITY PRIMARY CARE PRACTICES, INC. DURING THE RESTRICTIVE PERIOD OF SEPTEMBER, 1994 THROUGH DECEMBER 31, 1994.
Under Civ.R. 50(A)(4), a judge may properly grant a motion for directed verdict when, after construing the evidence most strongly in favor of the party against whom the motion is directed, it finds that reasonable minds could come to but one conclusion on a determinative issue, and the conclusion is adverse to the non-moving party.[21] Review of the grant or denial of a motion for directed verdict is de novo.[22] To the extent this claimed error refers to the jury's determination of the liability of Dr. Craig, we note that he has not submitted any brief on appeal, and our decision does not affect the jury's findings as to him.
UH argues that Harris presented no evidence that any specific patient defected to Dr. Craig because of any of its advertising efforts that may have violated the non-solicitation provision of the Harris-Craig agreement. Dr. Harris, however, testified that prior to the events giving rise to this suit, the patient turnover rate was almost zero. A jury could easily have made a causal connection between the advertising efforts undertaken by UH, which were largely confined to the communities in which Harris' patients lived, the indirect solicitation of them,[23]
and the verifiable transfer of the 216 patients. Further, the phone message service manipulation by Dr. Nochomovitz would seem to be an obvious indicator of intentional, improper interference with the Harris practice and patients who contacted it in search of Dr. Craig. UH's motion for a directed verdict was properly denied.
Citing our decision in Johnson v. Lakewood Hospital,[24] UH argues that it is entitled to a new trial because the judge improperly failed to include a jury instruction that required proof of "malice" as the necessary mens rea of tortious interference with contract. In Johnson,
where the claims were rooted in defamation, we held that malice needed to be proven in order to establish tortious interference with a contract. Specifically, we held:
 The standard of malice required to be shown in [tortious interference] cases, as well as the determination of privilege, may be different from what it is with respect to defamation cases. The question here, however, is whether the actual-malice standard required to defeat a qualified privilege in a defamation claim * * * must also be met for tortious interference and disparagement claims based on the same protected conduct or statements. We hold that it does.[25]
In Johnson, we answered a very specific question dealing with a particular hybrid of tortious interference/defamation cases, and acknowledged that a different level of intent may apply to tortious interference cases not intertwined with defamation claims. As such,Johnson is neither controlling nor dispositive.
The Ohio Supreme Court has held that the elements of tortious interference with contract are:
1. the existence of a contract;
2. the wrongdoer's knowledge of the contract;
 3. the wrongdoer's intentional procurement of the contract's breach;
4. lack of justification; and,
5. damages.[26]
The judge in the case sub judice instructed the jury verbatim as to the elements of tortious interference. "Malice," per se, is not a requirement, but rather, the concept of intentional impropriety is embodied in the third and fourth elements of the tort, intentional procurement and lack of justification.[27] Even if malice were an explicitly required element of the tort of tortious interference, the jury found malice according to a different jury instruction when it found UH liable for $200,000 in punitive damages; hence, UH's argument is unpersuasive.
UH contends that the judge impermissibly failed to instruct the jury that "fair competition" was a defense available to it. "Fair competition" is a defense to the interference with a contract that is terminable at will.[28] By definition, the restrictive clauses agreed to by Harris and Dr. Craig were not terminable at will, and actually became effective and enforceable only when the parties' professional association ended. The fact that any given patient may have terminated its relationship with the Harris practice at any time is both undisputed and irrelevant. Any patient's voluntary, unsolicited transfer to Dr. Craig's new practice, if located outside a five-mile radius of the Severance Medical Building would not have given rise to any liability on UH's part. The controversy here revolves around UH's conduct in locating and advertising Dr. Craig's new practice in violation of the non-competition and non-solicitation clauses it knew were in place and promised to honor, and does not concern the right of a given patient to be treated by the physician of his or her choice. This assignment of error has no merit.
 VII. DEFENDANTS-APPELLANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR BECAUSE PLAINTIFF-APPELLEE'S PURPORTED EVIDENCE OF DAMAGES WAS ENTIRELY SPECULATIVE.
Evidence of lost profits of a business as damages in a tort or contract action are permissible to the extent that they can be determined with reasonable certainty. "Proof of lost profits must be reasonably certain and may not be speculative. Where conclusory evidence of lost profits is presented, without supporting information explaining how the profits were calculated, there is insufficient evidence of such lost profits."[29]
UH asserts that the compensatory damages should not have been awarded because they were entirely speculative. In arriving at a damage figure for the jury's consideration, however, Harris' expert, Robert Brlas, used the following methodology:
 * He calculated the damage amount according to the relative fees generated overall by the rest of Harris's patients during 1993, and assuming damages flowing from the 216 patients who had submitted patient record transfer forms to Harris, requesting a transfer to Craig; and,
 * adjusted overall earnings from these patients over the next twenty years to account for varying levels of patient activity and longevity, and the time value of the money adjusted for inflation;
 * applied a 10% interest rate for profits generated; applied a discount rate of 30% to factor in the risks associated with the Harris practice and reduce the damages amount to reflect the present value of future earnings; and,
 * subtracted out overhead expenses that would have existed regardless of the number of patients the practice serviced, including office space, equipment, etc.
This test follows the same basic methodology used both by UH itself in evaluating the value of a practice it investigates for acquisition, and by UH's own expert at trial who quantified what he thought damages would be, assuming a breach. This test, all agreed, while not the exclusive test available for determining damages, is a widely known and accepted method of predicting future profits flowing from an enterprise or an identifiable portion of it. As such, the damages awarded in this case cannot be said to be speculative based on the methods used by Harris in arriving at the figure and that the jury ultimately accepted.
UH next contends that the damages were speculative because Harris did not demonstrate that the patients who transferred to Dr. Craig did so because of an impropriety on its part. Based on the evidence presented in the case, however, the jury could have logically concluded that damages resulted from the violation of the restrictive covenants based upon Dr. Harris' unrefuted testimony that the practice had a virtually non-existent patient attrition rate before Dr. Craig left, and because the damages asserted materialized within seven months of the wrongful conduct of Dr. Craig and UH. This assignment of error has no merit.
 VIII. DEFENDANT-APPELLANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR CONCERNING THE AWARD OF PUNITIVE DAMAGES AND THE SUBSEQUENT AWARD OF ATTORNEY'S FEES. IT WAS IMPROPER TO LET THE JURY DECIDE WHETHER TO AWARD PUNITIVE DAMAGES.
"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."[30]
 In the latter case, before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety.[31]
The award of punitive damages is to punish the offending party and to set him up as an example to others to deter similar conduct.[32]
UH asserts that it was clearly erroneous to submit the issue of punitive damages to the jury based on a complete lack of evidence of malice on its part. The record, however, reflects that it had promised to move Dr. Craig's practice outside the five-mile zone when it acknowledged that he was in violation, but not only misrepresented that Dr. Craig had moved, it continued to aggressively market his practice at Parkway months after being advised that it was a violation. Furthermore, the conduct of Dr. Nochomovitz in interfering with Harris' telephone answering service could be seen by a competent jury as highly indicative of conduct purposefully calculated to lead to harm. As such, the submission of the issue of punitive damages to the jury was proper. This assignment of error is without merit.
 IX. THE TRIAL COURT ERRED IN DENYING DEFENDANTS-APPELLANTS' MOTION FOR REMITTITUR OF COMPENSATORY AND PUNITIVE DAMAGES.
In Chester Park v. Schulte,[33] paragraph three of the syllabus, the Ohio Supreme Court set forth the specific criteria that must be met before a court may grant a remittitur:
(1) unliquidated damages are assessed by a jury,
 (2) the verdict is not influenced by passion or prejudice,
(3) the award is excessive, and
(4) the plaintiff agrees to the reduction in damages.
"If a verdict in an action for unliquidated damages is excessive, but not appearing to have been influenced by passion or prejudice, the court may, with the assent of plaintiff, reduce the verdict by remittitur to any amount warranted by the evidence."[34] If the prevailing party refuses to accept the remittitur, there should be a new trial.[35]
In the case sub judice, UH argues that an award against it of $313,453 in compensatory damages is disproportionate to recoverable damages because, while discussing the purchase of the Harris practice with UPCP, Dr. Harris' selling price was only $320,000. Awarding compensation for the loss of what UH describes as a relatively small percentage of Harris patients — 4.0% — in an amount almost equal to the sum Dr. Harris would have accepted for his entire practice UH submits, is unwarranted.
Its position, however, ignores the complete provisions of what Dr. Harris unsuccessfully proposed: $320,000 for the practice itself, $150,000 for the hard assets of the practice, a five-year employment contract that could approach upwards of $350,000+ yearly with performance bonuses, in addition to a bonus of $150,000 at the end of the five-year period; in short, more than $2,300,000 for the practice and Dr. Harris's subsequent employment. That being the case, it cannot be said that the jury's determination was so overwhelmingly above what Harris could expect at trial so as to warrant post-trial remittitur. Similarly, the jury could have properly concluded that an award of $200,000 in punitive damages would appropriately deter a health care entity like UH from engaging in what it found to be malicious conduct.
The jury, however, awarded Harris a total of $388,453 in compensatory damages based on the damage calculation of Robert Brlas which was predicated on the restrictive agreements remaining in effect until August 4, 1996. While it is apparent that the jury fully accepted his theories and rationale in granting Harris a judgment in the exact amount, down to the dollar, that Brlas suggested, the amount itself is based on the incorrect expiration date of the restrictive covenants. Brlas testified that, if the agreements had been assumed to expire on December 31, 1994, as we so hold, Harris would have sustained damages in the amount of $340,800. If we reduce the award of the jury to a ratio of the liabilities assigned by the jury to UH and Craig, we find that UH, in being assessed liability of $313,453, was apportioned 80.7% of the total compensatory-damage liability assigned. Eighty point seven percent (80.7%) of $340,800 is $275,026.
We hold that UH is entitled to a remittitur of $38,427, which represents the proportionate adjustment of its share of liability when $340,800 is used as the correct total damage award, based on the restrictive agreement's December 31, 1994 expiration date. This assignment of error has merit.
Accordingly, we reverse and remand this case to the trial court. Should Harris accept this reduction in compensatory damages, the judge shall enter judgment accordingly; if not, we order a new trial, with Harris and UH as the only parties, on the issue of compensatory damages.
 X. THE TRIAL COURT ERRED IN PREVENTING DEFENDANTS-APPELLANTS FROM REFERRING TO OR HAVING WITNESSES TESTIFY AND/OR MENTION THE COURT'S OPINION AND ORDER FROM THE 1995 TEMPORARY INJUNCTION HEARING.
At trial, the judge refused to allow UH to present testimony regarding, or make reference to, his April 1995, opinion that denied Harris's motions and ruled that the restrictive covenants at issue expired on December 31, 1994. He cited Kalk v. Woodmere,[36] from the Eighth District, which held, "[t]he doctrines of res judicata and collateral estoppel apply only where a court has in a prior action decided a particular matter (1) between the same parties, and (2) carried its decision to judgment. An order granting a temporary or preliminary injunction is not judgment."[37] UH argues that the ruling was prejudicial because it resulted in an unnecessary duplicative determination of issues already fully litigated and also resulted in a punitive damages award based on the conduct of UH after December 31, 1994.
As we held above, however, the award of punitive damages in this case was properly based on UH's violations of the restrictive clauses prior to December 31, 1994, when the agreement terminated. Even assuming,arguendo, that the ruling was error, given our ruling on the termination date of the employment agreement, no prejudice resulted. This assignment of error has no merit.
 XI. DEFENDANTS-APPELLANTS UNIVERSITY HOSPITALS OF CLEVELAND, UNIVERSITY PRIMARY CARE PRACTICES, INC. AND UNIVERSITY HOSPITALS HEALTH SYSTEMS, INC. ARE ENTITLED TO JUDGMENT IN THEIR FAVOR BECAUSE PLAINTIFF-APPELLEE'S COMPLAINT WAS IMPROPERLY PLED AND SHOULD HAVE BEEN STRICKEN AND DISMISSED IN ITS ENTIRETY.
UH asserts that this case should have been dismissed the day before trial because the complaint was worded in such a way that each separate count or cause of action was not readily identifiable, as required under Civ.R. 8(A) and 10(B). The procedure for addressing pleading deficiencies under Civ.R. 10(B) and 12(E) is to move for a definite statement at the pleading stage, and UH never did. The judge correctly denied UH's oral motion to dismiss the day before trial and concluded that, after approximately five years of protracted, contentious litigation, UH would have some idea of the issues involved in this case. This assignment of error is overruled.
 XII. THE TRIAL COURT ERRED WHEN IT AWARDED ATTORNEY FEES IN FAVOR OF PLAINTIFF-APPELLEE FREDERICK D. HARRIS, M.D., INC. BECAUSE THE ISSUE OF WHETHER TO AWARD ATTORNEY FEES WAS NEVER CONSIDERED BY THE JURY IN ITS AWARD OF PUNITIVE DAMAGES.
CROSS-ASSIGNMENT OF ERROR II.
 THE TRIAL COURT ABUSED ITS DISCRETION TO HARRIS' PREJUDICE BY HOLDING THAT HARRIS WAS NOT ENTITLED TO ALL OF ITS ATTORNEYS FEES ARISING FROM HARRIS' PROSECUTION OF ITS TORTIOUS INTERFERENCE CLAIM AGAINST UNIVERSITY HOSPITAL.
"In view of the public policy of this state that favors jury determination of issues of liability, * * * a trial court must submit to a jury the issue of whether attorney fees should be awarded in a tort action."[38] After a jury determination that a defendant is liable for such fees as a part of a punitive damages award, the amount to be awarded rests within the discretion of the judge.[39] According to Civ.R. 51, in relevant part,
 On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.[40]
In the case sub judice, before closing argument, the parties vigorously debated, and the judge ruled on, what jury instructions would be given. A jury instruction asking for a determination of entitlement to attorney's fees, should punitive damages be awarded, was not included in the final set of instructions either agreed to by the parties or decided by the judge. Just before its rebuttal to the jury, Harris requested that an instruction be added regarding attorney's fees, in the event that punitive damages be awarded. UH and Dr. Craig objected on the grounds that neither would have an opportunity to address the jury on the point because their portion of closing argument had concluded. The judge ruled, however, should the jury return a punitive damage award, he would consider the issue of reasonable attorney's fees upon post-trial motion. This was error because it usurped the jury's function to award the possible attorney fees as part of an award for punitive damages.
In objecting to the omission of a jury instruction to determine the inclusion of reasonable attorney's fees as part of any punitive damage award, Harris preserved this assignment of error by objecting timely under Civ.R. 51(A), supra, in objecting before its rebuttal closing argument, and hence, before the jury retired to consider its verdict. In addition, while a jury instruction on the issue of the possible award of attorney's fees was inadvertently omitted from consideration as the parties and the judge discussed in chambers, before closing argument, what the jury instructions would be, Harris consistently submitted to the court and opposing counsel written proposed jury instructions, including such an instruction, in pre-trial submissions filed December 8, 1998 and in a set of revised instructions apparently not filed, but served upon UH on April 13, 1999, while trial was in progress.
Accordingly, UH's twelfth assignment of error is well taken and the case is remanded for a new trial on the issue of Harris's entitlement to attorney's fees. Our disposition of that assignment renders Harris's second cross-assignment of error moot.
 XIII. THE TRIAL COURT ERRED IN GRANTING JUDGMENT AGAINST UNIVERSITY HOSPITALS OF CLEVELAND AND UNIVERSITY HOSPITALS HEALTH SYSTEMS, INC. BECAUSE NO EVIDENCE WAS PRESENTED THAT ANY ACTIVITY WHICH OCCURRED CONCERNED THESE TWO ENTITIES.
The verdict form signed by the jurors was captioned, "Frederick D. Harris, M.D., Inc. v. University Hospitals of Cleveland, et al.," and reads as follows:
 The jury in this case, being duly empaneled and Sworn, upon the concurrence of the undersigned Jurors, being not less than three-fourths the number thereof, do find for the Plaintiff in the sum of $313,453 in compensatory damages and $200,000 in punitive damages.
After disposing of post-trial motions for attorney's fees, JNOV or a new trial and remittitur, the judge issued the following final order: "* * * Jury verdict is amended to show the defendants to be University Primary Care Practices, Inc. and University Hospital Health Systems in addition to University Hospitals of Cleveland.* * *"[41] UH now contends that the judgment rendered against all UH-affiliated Defendants should only have been rendered against UPCP because the evidence only implicated that specific UH entity.[42]
At trial it was undisputed that the advertising of and for the Craig/Myton-Craig practice was undertaken and co-ordinated by Katherine Komanyek, an employee of University Hospitals of Cleveland, and Cliff Coker, a vice president with University Hospitals Health Systems. It is also undisputed that University Hospitals Health Systems, through its corporate counsel Robert Secrist, issued the veiled threat of relocating the Craigs at the Severance Medical Building upon expiration of the non-compete/non-solicitation restraints. Dr. Nochomovitz was, at all relevant times, medical director for UPCP and answered both to Coker and to Farah Walters, the CEO of University Hospitals Health Systems. Finally, it is undisputed that UPCP is the entity which hired Dr. Craig when he left the Harris practice.
The issues in this case, as noted above, center around the actions of UPCP (through Dr. Nochomovitz) and the actions of UHHS (through Coker and Secrist) in improperly placing Craig within the non-competition zone, in conjunction with UHOC's Komanyek, advertising the Craig practice in violation of the restrictive clauses in the Harris employment agreement. Counsel for all of these UH-affiliated entities made no differentiation between any of them, either in the presentation of its case or in the verdict forms submitted by the judge to the jury. Absent a reason to do otherwise, we presume regularity in the jury's verdict. This assignment of error is not well taken.
 XIV. THE CONDUCT OF THE TRIAL JUDGE DENIED DEFENDANTS-APPELLANTS THEIR RIGHT TO A FAIR AND IMPARTIAL TRIAL.
UH claims that it did not receive a fair trial in this case because of a hodgepodge of evidentiary and other errors. It claims it was denied the opportunity to delve into the specifics of Dr. Harris's personal finances which would have proven that it declined to purchase the Harris practice because of his skewed valuation of it. This evidence, however, would be completely irrelevant to the issues presented; Harris did not sue to force UH to purchase the practice, but rather to recover damages caused by the conduct of UH after such decision has been made. As such, there was no error.
UH claims it was error to admit testimony about the reasonableness of the restrictive provisions in Dr. Craig's contract. In line with our disposition of Assignment of Error II, however, we conclude that the provisions at issue were reasonable, and any error in the admission of improper opinion testimony from non-expert witnesses was harmless.[43]
UH also argues that it was improper for Harris to introduce patients' record-transfer request forms or the 1993 billing data for each patient because that violated the physician-patient confidentiality protected by R.C. 2317.02(B). These records were introduced as the foundation for the anonymous aggregate of financial data used by Robert Brlas to calculate the damage done to the Harris practice through the defection of Harris-practice patients. In addition, while UH did argue prior to the introduction of the records at trial that certain information in the records, such as the identities of the patients, was protected by the physician-client privilege, at hearing outside the presence of the jury, counsel for Harris represented to the court that such information would be redacted from the records prior to being placed in evidence. This, however, did not occur, and the transfer-requests actually admitted into evidence do reveal patient identities and addresses. In addition, each transfer request is accompanied by a patient billing history; some of the billing histories contain descriptions of treatments or services performed.
Physician-patient privilege in Ohio is statutorily defined by R.C.2317.02, which provides in part:
 The following persons shall not testify in certain respect:
* * *
 (B)(1) A physician or a dentist concerning a communication made to the physician or dentist by a patient in that relation or the physician's or dentist's advice to a patient, except as otherwise provided in this division, division (B)(2), and division (B)(3) of this section, and except that, if the patient is deemed by section 2151.421 [2151.42.1] of the Revised Code to have waived any testimonial privilege under this division, the physician may be compelled to testify on the same subject.
 The testimonial privilege established under this division does not apply, and a physician or dentist may testify or may be compelled to testify, in any of the following circumstances:
 (a) In any civil action, in accordance with the discovery provisions of the Rules of Civil Procedure in connection with a civil action, or in connection with a claim under Chapter 4123. of the Revised Code, under any of the following circumstances:
 (i) If the patient or the guardian or other legal representative of the patient gives express consent;
 (ii) If the patient is deceased, the spouse of the patient or the executor or administrator of the patient's estate gives express consent;
 (iii) If a medical claim, dental claim, chiropractic claim, or optometric claim, as defined in section 2305.11 of the Revised Code, an action for wrongful death, any other type of civil action, or a claim under Chapter 4123. of the Revised Code is filed by the patient, the personal representative of the estate of the patient if deceased, or the patient's guardian or other legal representative.
* * *
 (3)(a) If the testimonial privilege described in division (B)(1) of this section does not apply as provided in division (B)(1)(a)(iii) of this section, a physician or dentist may be compelled to testify or to submit to discovery under the Rules of Civil Procedure only as to a communication made to the physician or dentist by the patient in question in that relation, or the physician's or dentist's advice to the patient in question, that related causally or historically to physical or mental injuries that are relevant to issues in the medical claim, dental claim, chiropractic claim, or optometric claim, action for wrongful death, other civil action, or claim under Chapter 4123. of the Revised Code.
* * *
 (5)(a) As used in divisions (B)(1) to (4) of this section, "communication" means acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician or dentist to diagnose, treat, prescribe, or act for a patient. A "communication" may include, but is not limited to, any medical or dental, office, or hospital communication such as a record, chart, letter, memorandum, laboratory test and results, x-ray, photograph, financial statement, diagnosis, or prognosis.[44]
Accordingly, absent the express consent of a patient[45] or a deceased patient's estate,[46] or the patient's voluntary placement of his or her medical condition at issue by filing a civil suit or seeking worker's compensation benefits,[47] the physician-patient privilege, which is held by the patient, cannot be breached by a treating physician. Even where a physician can be compelled to reveal a "communication" as defined by R.C. 2317.02(B)(5)(a) to include medical records, which by definition contain the identity of a given patient, the information disclosed by the physician which would have otherwise been protected by physician-patient privilege includes only the diagnosis or treatment of the patient's medical injuries[48] once the patient's medical condition becomes an issue due to some action on the part of the patient or his representative. As the Ohio Supreme Court has held,
 [T]here may be special situations where the interests of the patient will justify the creation of a privilege to disclose. However, the only interest that has been recognized in this regard is the patient's interest in obtaining medical care and treatment, and disclosure is limited to those who have a legitimate interest in the patient's health. * * * Otherwise, it is for the patient — not some medical practitioner, lawyer, or court — to determine what the patient's interests are with regard to personal confidential medical information.[49]
Ohio Courts have carved out exceptions to the general physician-patient privilege in circumstances where patient records, with identifying characteristics of the patients redacted, may be required to be produced absent patient consent where the State seeks to criminally prosecute physicians for wrongful treatment or fraud,[50] and a Federal court, applying R.C. 2317.02, has created an exception where an insurer seeks information crucial to a defense of a lawsuit initiated by a physician.[51] As such, it seems that, had Harris redacted information from the releases/records admitted into evidence linking the patients' identities with their billing or treatment records or record release forms, such admission would have been proper. As no redaction took place, these records were improperly admitted into evidence.
Although these records, in the form they were submitted to the jury, were improperly admitted, their improper admission need result in reversal only upon the demonstration by UH that admission of this evidence affected its substantial rights.[52] Even without the admission of these records into evidence at trial, the jury heard testimony from Robert Brlas that these were the records he used in forming his own opinions and statistical predictions of what Harris's loss of patients meant in terms of damages. Additionally, these records were not introduced for the purpose of entering the name of any given former Harris patient into the record, but, rather, to demonstrate simply that patients did in fact leave the practice for Dr. Craig. Because the identity of the patients who left the Harris practice, as evidence, is entirely irrelevant to the financial impact demonstrated to occur when an anonymous, faceless number of them may have defected (which was the foundation of Brlas's testimony), any error, as between Harris and UH, in the introduction of unredacted patient transfer request forms or billing records was harmless.[53]
Finally, UH complains that the judge engaged in a limited skirmish with its lawyer about his cross-examination of a witness and, when Harris' lawyer was accused of signaling a witness, the judge took no action. It does not reveal to us what prejudice flowed from these alleged errors and none is obvious. This assignment of error lacks merit.
CROSS-ASSIGNMENT OF ERROR I.
 THE TRIAL COURT ABUSED ITS DISCRETION TO HARRIS' PREJUDICE BY DENYING HARRIS THE OPPORTUNITY TO DISCOVER AND PRESENT TO THE JURY RELEVANT DAMAGES EVIDENCE.
The Harris practice could not account for the loss of 346 patients who had not submitted record-transfer requests and sought to discover the identity of all the Craig practice patients to ascertain whether more than 216 of its patients had defected to it, and also requested information relative to fees generated by the Craig practice for the treatment of former Harris patients. UH refused to provide this information, under a myriad of theories including that responding to these requests constituted an undue burden. Harris claims Judge Calabrese erred in denying such discovery, when he granted a protective order to that effect on May 15, 1996, and denied its motion to reconsider his ruling on October 19, 1998.
Civ.R. 26(C) provides, in part: "Upon motion by any party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had * * *." This rule gives judges inherent and broad authority to regulate discovery.[54]
Multiple discovery disputes occurred in this case, initiated by both Harris and UH, which ultimately resulted in the failure of the parties to complete discovery until late 1998. Without knowledge of the actual effort UH would have had to expend in retrieving Dr. Craig's entire patient list and sort out all patients who had been formerly treated by the Harris practice, we cannot find an abuse of discretion in the judge's ruling to bar discovery of Dr. Craig's patient lists or the names of all former Harris patients who subsequently chose to seek treatment from Dr. Craig while affiliated with UH. Additionally, Harris undoubtably had in its possession the names of all its patients who stopped treating with it, for whatever reason. We fail to see prejudice flowing from the judge's protective order, considering that Harris could have simply contacted former patients to inquire by whom they were being treated.
Additionally, while a plaintiff can recover damages from a defendant's tortious interference with a contract, the measure of those damages is the actual loss sustained by the plaintiff, and not the benefits or profits that flowed to a defendant because of the tortious interference.[55] As such, it was not an abuse of discretion to deny Harris's request to force UH or Craig to divulge information regarding profits generated by former Harris practice patients. Harris' first cross-assignment of error is without merit.
In conclusion, we sustain UH's first assignment of error and hold that the restrictive covenants at issue were enforceable until December 31, 1994. UH's ninth assignment of error is sustained and it is entitled to a remittitur of $38,427, which Harris may accept, or to a new trial consistent with this opinion if Harris rejects. UH's twelfth assignment of error is sustained and the award of attorney's fees is vacated, rendering Harris's second cross-assignment of error moot. All other assignments of error and cross-assignments are overruled.
Judgment affirmed in part, reversed in part and remanded.
It is ordered that the parties bear their own costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, P.J., and FRANK D. CELEBREZZE, JR., J., CONCUR.
[1] Employment Agreement, Section VI.(C).
[2] Employment Agreement, Section VI.(B).
[3] The individual claims of Dr. Harris were dismissed without prejudice.
[4] While Dr. Craig properly perfected a notice of appeal to this court, he did not file a brief asserting assignments of error or incorporating the assignments of error argued by UH.
[5] Kelly v. Med. Life Ins. Co. (1987), 31 Ohio St.3d 130,509 N.E.2d 411, paragraph one of the syllabus; Aultman Hosp. Assn. v.Community Mut. Ins. Co. (1989), 46 Ohio St.3d 51, 544 N.E.2d 920, syllabus.
[6] Kelly, supra, at 132, 509 N.E.2d at 413.
[7] Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241,246, 374 N.E.2d 146, 150.
[8] Shifrin v. Forest City Enterprises (1992), 64 Ohio St.3d 635,638, 597 N.E.2d 499, 501.
[9] Raimonde v. Van Vlerah (1975), 42 Ohio St.2d 21, 24, 325 N.E.2d 544,546.
[10] Ohio Urology, Inc. v. Poll (1991), 72 Ohio App.3d 446, 452-453,594 N.E.2d 1027, 1031.
[11] See discussion of assignment of error IX.
[12] Raimonde, supra, at syllabus.
[13] Id. at 25, 325 N.E.2d at 547.
[14] See e.g. Holzer Clinic, Inc. v. Simpson (Apr. 28, 1998), Gallia App. No. 97CA9, unreported (fifteen-mile radius for one year); H.R.Graphics v. Lake-Perry (Jan. 30, 1997), Cuyahoga App. No. 70696, unreported (350 mile radius for one year); Wall v. Firelands Radiology,Inc. (1995), 106 Ohio App.3d 313, 331, 666 N.E.2d 235 (twenty-mile radius for up to three years); James H. Washington Ins. Agency v. NationwideMut. Ins. Co. (1993), 95 Ohio App.3d 577, 589, 643 N.E.2d 143 (twenty five mile radius for one year); Neer v. Clark, 1993 Ohio App. LEXIS 5723 (Dec. 3, 1993), Sandusky App. No. 5-93-1, unreported (twenty-mile radius for three years); Kaeser v. Adamson, 1984 Ohio App. LEXIS 9549 (Mar. 6, 1984), Ashland App. No. CA-800, unreported (twenty-mile radius for five years).
[15] In Ohio Urology Inc. v. Poll (1991), 72 Ohio App.3d 446,594 N.E.2d 1027, the physician was a kidney stone specialist accomplished in lithotripsy; In Williams v. Hobbs (1983), 9 Ohio App.3d 331,460 N.E.2d 287, the physician had a subspecialty in interventional radiology; In Lewis v. Surgery Gynecology, Inc. (March 12, 1991), Franklin App. No. 90AP-300, unreported, an osteopathic urologic surgeon had special training in lithotripsy and his employer interfered with the physician's potential employment and Darrow v. Kolczun (Mar. 6, 1991), Lorain App. No. 90CA004759, unreported, involved the modification of a liquidated damages clause in a restrictive covenant which was unlimited with respect to time for a physician whose orthopedic hand specialty was in demand in the two rural counties from which the restrictive covenant sought to exclude him.
[16] (1990), 69 Ohio App.3d 753, 591 N.E.2d 1265.
[17] PICA, supra, at 758, 591 N.E.2d at 1268; and R.C. 1335.05.
[18] Id. at 758-759, 591 N.E.2d at 1268.
[19] See Acceleration Life Ins. Co. v. Walsh (June 4, 1987), Cuyahoga App. No. 52266, unreported.
[20] See Drs. Guren, Jaffe Assoc., Inc. dba American Dental Centersv. Phillip (Oct. 5, 1984), Lake County App. No. 10-112, unreported, relying on State v. Sheperd (1980), 61 Ohio St.2d 328, 331, 401 N.E.2d 934, * * *.
[21] See Civ.R. 50(A)(4).
[22] Grau v. Kleinschmidt (1987), 31 Ohio St.3d 84, 90, 509 N.E.2d 399;Steppe v. K-mart Stores (1999), 136 Ohio App.3d 454, 737 N.E.2d 58.
[23] By "indirect solicitation," we mean bulk advertisement designed to be seen by a substantial number of persons in the principal areas in which Harris's patients lived, whether or not patients of the practice. "Direct solicitation," in our view would mean concentrated marketing directed at a discrete number of identifiable individuals already part of the Harris practice, calculated to persuade them to defect.
[24] (Sept. 4, 1997), Cuyahoga App. Nos. 70943 and 71257, unreported.
[25] Johnson v. Lakewood Hospital, supra.
[26] Kenty v. Transamerica Premium Ins. Co. (1995), 72 Ohio St.3d 415,650 N.E.2d 863, syllabus, paragraph 2.
[27] See Fred Siegel Co., L.P.A. v. Arter Hadden (1999),85 Ohio St.3d 171, 707 N.E.2d 853.
[28] Fred Siegel Co., L.P.A. v. Arter Hadden, supra, at 179-180,707 N.E.2d at 861.
[29] Kinetico, Inc. v. Independent Ohio Nail Co. (1984),19 Ohio App.3d 26, 30, 482 N.E.2d 1345, 1350.
[30] Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.
[31] Id. at 336, 512 N.E.2d at 1176.
[32] Id. at 335, 512 N.E.2d at 1176.
[33] (1929), 120 Ohio St. 273, 166 N.E. 186.
[34] Larrissey v. Norwalk Truck Lines, Inc. (1951), 155 Ohio St. 207,219, 98 N.E.2d 419, 426.
[35] Burke v. Athens (1997), 123 Ohio App.3d 98, 102; 703 N.E.2d 804,806.
[36] (1985), 27 Ohio App.3d 145, 500 N.E.2d 384.
[37] Kalk, supra, at 149, 404 N.E.2d at 389. (Citation omitted.)
[38] Digital Analog Design Corp. v. North Supply Co. (1992),63 Ohio St.3d 657, 590 N.E.2d 737, syllabus, paragraph 3.
[39] Id. at 664, 590 N.E.2d at 743.
[40] Civ.R. 51(A), second paragraph.
[41] See Journal Entry, July 2, 1999, Vol. 2357, pg. 664.
[42] Organizationally, University Hospitals Health Systems is a parent company, with University Hospitals of Cleveland and UPCP as subsidiaries.
[43] See Civ.R. 61: ". . . [N]o error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."
[44] R.C. 2317.02(B).
[45] R.C. 2317.02(B)(1)(a)(i).
[46] R.C. 2317.02(B)(1)(a)(ii).
[47] R.C. 2317.02(B)(1)(a)(iii).
[48] R.C. 2317.02(B)(3)(a).
[49] Biddle v. Warren General Hospital (1999), 86 Ohio St.3d 395,407-408; 715 N.E.2d 518, 528.
[50] State v. McGriff (1996), 109 Ohio App.3d 668; 672 N.E.2d 1074.
[51] Varghese v. Royal Maccabees Life Ins. Co. (1998), 181 F.R.D. 359
(S.D., Ohio.)
[52] See Civ.R. 61.
[53] Id.
[54] State ex rel. Grandview Hosp. Med. Ctr. v. Gorman (1990),51 Ohio St.3d 94, 554 N.E.2d 1297.
[55] Developers Three v. Nationwide Insurance Co. (1990),64 Ohio App.3d 794, 802-803; 582 N.E.2d 1130, 1135-1136.